(Slip Opinion) OCTOBER TERM, 2017 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## COLLINS *v.* VIRGINIA

### CERTIORARI TO THE SUPREME COURT OF VIRGINIA

No. 16–1027. Argued January 9, 2018—Decided May 29, 2018

During the investigation of two traffic incidents involving an orange and black motorcycle with an extended frame, Officer David Rhodes learned that the motorcycle likely was stolen and in the possession of petitioner Ryan Collins. Officer Rhodes discovered photographs on Collins' Facebook profile of an orange and black motorcycle parked in the driveway of a house, drove to the house, and parked on the street. From there, he could see what appeared to be the motorcycle under a white tarp parked in the same location as the motorcycle in the photograph. Without a search warrant, Office Rhodes walked to the top of the driveway, removed the tarp, confirmed that the motorcycle was stolen by running the license plate and vehicle identification numbers, took a photograph of the uncovered motorcycle, replaced the tarp, and returned to his car to wait for Collins. When Collins returned, Officer Rhodes arrested him. The trial court denied Collins' motion to suppress the evidence on the ground that Officer Rhodes violated the Fourth Amendment when he trespassed on the house's curtilage to conduct a search, and Collins was convicted of receiving stolen property. The Virginia Court of Appeals affirmed. The State Supreme Court also affirmed, holding that the warrantless search was justified under the Fourth Amendment's automobile exception.

*Held*: The automobile exception does not permit the warrantless entry of a home or its curtilage in order to search a vehicle therein. Pp. 3–14.

    (a) This case arises at the intersection of two components of the Court's Fourth Amendment jurisprudence: the automobile exception to the warrant requirement and the protection extended to the curtilage of a home. In announcing each of the automobile exception's justifications—*i.e.,* the "ready mobility of the automobile" and "the pervasive regulation of vehicles capable of traveling on the public

highways," *California* v. *Carney,* 471 U. S. 386, 390, 392—the Court emphasized that the rationales applied only to automobiles and not to houses, and therefore supported their different treatment as a constitutional matter. When these justifications are present, officers may search an automobile without a warrant so long as they have probable cause. Curtilage—"the area 'immediately surrounding and associated with the home'"—is considered "'part of the home itself for Fourth Amendment purposes.'" *Florida* v. *Jardines,* 569 U. S. 1, 6. Thus, when an officer physically intrudes on the curtilage to gather evidence, a Fourth Amendment search has occurred and is presumptively unreasonable absent a warrant. Pp. 3–6.

(b) As an initial matter, the part of the driveway where Collins' motorcycle was parked and subsequently searched is curtilage. When Officer Rhodes searched the motorcycle, it was parked inside a partially enclosed top portion of the driveway that abuts the house. Just like the front porch, side garden, or area "outside the front window," that enclosure constitutes "an area adjacent to the home and 'to which the activity of home life extends.'" *Jardines*, 569 U. S., at 6, 7.

Because the scope of the automobile exception extends no further than the automobile itself, it did not justify Officer Rhodes' invasion of the curtilage. Nothing in this Court's case law suggests that the automobile exception gives an officer the right to enter a home or its curtilage to access a vehicle without a warrant. Such an expansion would both undervalue the core Fourth Amendment protection afforded to the home and its curtilage and "'untether'" the exception "'from the justifications underlying'" it. *Riley* v. *California,* 573 U. S. ___, ___. This Court has similarly declined to expand the scope of other exceptions to the warrant requirement. Thus, just as an officer must have a lawful right of access to any contraband he discovers in plain view in order to seize it without a warrant—see *Horton* v. *California,* 496 U. S. 128, 136–137—and just as an officer must have a lawful right of access in order to arrest a person in his home—see *Payton* v. *New York,* 445 U. S. 573, 587–590—so, too, an officer must have a lawful right of access to a vehicle in order to search it pursuant to the automobile exception. To allow otherwise would unmoor the exception from its justifications, render hollow the core Fourth Amendment protection the Constitution extends to the house and its curtilage, and transform what was meant to be an exception into a tool with far broader application. Pp. 6–11.

(c) Contrary to Virginia's claim, the automobile exception is not a categorical one that permits the warrantless search of a vehicle anytime, anywhere, including in a home or curtilage. *Scher* v. *United States,* 305 U. S. 251; *Pennsylvania* v. *Labron,* 518 U. S. 938, distinguished. Also unpersuasive is Virginia's proposed bright line rule for

Syllabus

an automobile exception that would not permit warrantless entry only of the house itself or another fixed structure, *e.g.*, a garage, inside the curtilage. This Court has long been clear that curtilage is afforded constitutional protection, and creating a carveout for certain types of curtilage seems more likely to create confusion than does uniform application of the Court's doctrine. Virginia's rule also rests on a mistaken premise, for the ability to observe inside curtilage from a lawful vantage point is not the same as the right to enter curtilage without a warrant to search for information not otherwise accessible. Finally, Virginia's rule automatically would grant constitutional rights to those persons with the financial means to afford residences with garages but deprive those persons without such resources of any individualized consideration as to whether the areas in which they store their vehicles qualify as curtilage. Pp. 11–14.

292 Va. 486, 790 S. E. 2d 611, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, GINSBURG, BREYER, KAGAN, and GORSUCH, JJ., joined. THOMAS, J., filed a concurring opinion. ALITO, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 16–1027

RYAN AUSTIN COLLINS, PETITIONER *v.* VIRGINIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF VIRGINIA

[May 29, 2018]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

This case presents the question whether the automobile exception to the Fourth Amendment permits a police officer, uninvited and without a warrant, to enter the curtilage of a home in order to search a vehicle parked therein. It does not.

I

Officer Matthew McCall of the Albemarle County Police Department in Virginia saw the driver of an orange and black motorcycle with an extended frame commit a traffic infraction. The driver eluded Officer McCall's attempt to stop the motorcycle. A few weeks later, Officer David Rhodes of the same department saw an orange and black motorcycle traveling well over the speed limit, but the driver got away from him, too. The officers compared notes and concluded that the two incidents involved the same motorcyclist.

Upon further investigation, the officers learned that the motorcycle likely was stolen and in the possession of petitioner Ryan Collins. After discovering photographs on Collins' Facebook profile that featured an orange and black motorcycle parked at the top of the driveway of a

house, Officer Rhodes tracked down the address of the house, drove there, and parked on the street. It was later established that Collins' girlfriend lived in the house and that Collins stayed there a few nights per week.[1]

From his parked position on the street, Officer Rhodes saw what appeared to be a motorcycle with an extended frame covered with a white tarp, parked at the same angle and in the same location on the driveway as in the Facebook photograph. Officer Rhodes, who did not have a warrant, exited his car and walked toward the house. He stopped to take a photograph of the covered motorcycle from the sidewalk, and then walked onto the residential property and up to the top of the driveway to where the motorcycle was parked. In order "to investigate further," App. 80, Officer Rhodes pulled off the tarp, revealing a motorcycle that looked like the one from the speeding incident. He then ran a search of the license plate and vehicle identification numbers, which confirmed that the motorcycle was stolen. After gathering this information, Officer Rhodes took a photograph of the uncovered motorcycle, put the tarp back on, left the property, and returned to his car to wait for Collins.

Shortly thereafter, Collins returned home. Officer Rhodes walked up to the front door of the house and knocked. Collins answered, agreed to speak with Officer Rhodes, and admitted that the motorcycle was his and that he had bought it without title. Officer Rhodes then arrested Collins.

Collins was indicted by a Virginia grand jury for receiving stolen property. He filed a pretrial motion to suppress the evidence that Officer Rhodes had obtained as a result of the warrantless search of the motorcycle. Collins argued that Officer Rhodes had trespassed on the curtilage

─────────────

[1] Virginia does not dispute that Collins has Fourth Amendment standing. See *Minnesota* v. *Olson*, 495 U. S. 91, 96–100 (1990).

of the house to conduct an investigation in violation of the Fourth Amendment. The trial court denied the motion and Collins was convicted.

The Court of Appeals of Virginia affirmed. It assumed that the motorcycle was parked in the curtilage of the home and held that Officer Rhodes had probable cause to believe that the motorcycle under the tarp was the same motorcycle that had evaded him in the past. It further concluded that Officer Rhodes' actions were lawful under the Fourth Amendment even absent a warrant because "numerous exigencies justified both his entry onto the property and his moving the tarp to view the motorcycle and record its identification number." 65 Va. App. 37, 46, 773 S. E. 2d 618, 623 (2015).

The Supreme Court of Virginia affirmed on different reasoning. It explained that the case was most properly resolved with reference to the Fourth Amendment's automobile exception. 292 Va. 486, 496–501, 790 S. E. 2d 611, 616–618 (2016). Under that framework, it held that Officer Rhodes had probable cause to believe that the motorcycle was contraband, and that the warrantless search therefore was justified. *Id.,* at 498–499, 790 S. E. 2d, at 617.

We granted certiorari, 582 U. S. ___ (2017), and now reverse.

II

The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." This case arises at the intersection of two components of the Court's Fourth Amendment jurisprudence: the automobile exception to the warrant requirement and the protection extended to the curtilage of a home.

### A
### 1

The Court has held that the search of an automobile can be reasonable without a warrant. The Court first articulated the so-called automobile exception in *Carroll* v. *United States*, 267 U. S. 132 (1925). In that case, law enforcement officers had probable cause to believe that a car they observed traveling on the road contained illegal liquor. They stopped and searched the car, discovered and seized the illegal liquor, and arrested the occupants. *Id.,* at 134–136. The Court upheld the warrantless search and seizure, explaining that a "necessary difference" exists between searching "a store, dwelling house or other structure" and searching "a ship, motor boat, wagon or automobile" because a "vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Id.,* at 153.

The "ready mobility" of vehicles served as the core justification for the automobile exception for many years. *California* v. *Carney*, 471 U. S. 386, 390 (1985) (citing, *e.g., Cooper* v. *California*, 386 U. S. 58, 59 (1967); *Chambers* v. *Maroney*, 399 U. S. 42, 51–52 (1970)). Later cases then introduced an additional rationale based on "the pervasive regulation of vehicles capable of traveling on the public highways." *Carney,* 471 U. S., at 392. As the Court explained in *South Dakota* v. *Opperman*, 428 U. S. 364 (1976):

> "Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper

working order." *Id.,* at 368.

In announcing each of these two justifications, the Court took care to emphasize that the rationales applied only to automobiles and not to houses, and therefore supported "treating automobiles differently from houses" as a constitutional matter. *Cady* v. *Dombrowski*, 413 U. S. 433, 441 (1973).

When these justifications for the automobile exception "come into play," officers may search an automobile without having obtained a warrant so long as they have probable cause to do so. *Carney*, 471 U. S., at 392–393.

2

Like the automobile exception, the Fourth Amendment's protection of curtilage has long been black letter law. "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida* v. *Jardines*, 569 U. S. 1, 6 (2013). "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Ibid.* (quoting *Silverman* v. *United States*, 365 U. S. 505, 511 (1961)). To give full practical effect to that right, the Court considers curtilage—"the area 'immediately surrounding and associated with the home'"—to be "'part of the home itself for Fourth Amendment purposes.'" *Jardines*, 569 U. S., at 6 (quoting *Oliver* v. *United States*, 466 U. S. 170, 180 (1984)). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *California* v. *Ciraolo*, 476 U. S. 207, 212–213 (1986).

When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred. *Jardines*, 569 U. S., at 11. Such conduct thus is presumptively unrea-

sonable absent a warrant.

## B

### 1

With this background in mind, we turn to the applica-
tion of these doctrines in the instant case. As an initial
matter, we decide whether the part of the driveway where
Collins' motorcycle was parked and subsequently searched
is curtilage.

According to photographs in the record, the driveway
runs alongside the front lawn and up a few yards past the
front perimeter of the house. The top portion of the
driveway that sits behind the front perimeter of the house
is enclosed on two sides by a brick wall about the height of
a car and on a third side by the house. A side door pro-
vides direct access between this partially enclosed section
of the driveway and the house. A visitor endeavoring to
reach the front door of the house would have to walk
partway up the driveway, but would turn off before enter-
ing the enclosure and instead proceed up a set of steps
leading to the front porch. When Officer Rhodes searched
the motorcycle, it was parked inside this partially enclosed
top portion of the driveway that abuts the house.

The "'conception defining the curtilage' is . . . familiar
enough that it is 'easily understood from our daily experi-
ence.'" *Jardines*, 569 U. S., at 7 (quoting *Oliver*, 466 U. S.,
at 182, n. 12). Just like the front porch, side garden, or
area "outside the front window," *Jardines,* 569 U. S., at 6,
the driveway enclosure where Officer Rhodes searched the
motorcycle constitutes "an area adjacent to the home and
'to which the activity of home life extends,'" and so is
properly considered curtilage, *id.,* at 7 (quoting *Oliver*, 466
U. S., at 182, n. 12).

### 2

In physically intruding on the curtilage of Collins' home

to search the motorcycle, Officer Rhodes not only invaded Collins' Fourth Amendment interest in the item searched, *i.e.,* the motorcycle, but also invaded Collins' Fourth Amendment interest in the curtilage of his home. The question before the Court is whether the automobile exception justifies the invasion of the curtilage.[2] The answer is no.

Applying the relevant legal principles to a slightly different factual scenario confirms that this is an easy case. Imagine a motorcycle parked inside the living room of a house, visible through a window to a passerby on the street. Imagine further that an officer has probable cause to believe that the motorcycle was involved in a traffic infraction. Can the officer, acting without a warrant, enter the house to search the motorcycle and confirm whether it is the right one? Surely not.

The reason is that the scope of the automobile exception extends no further than the automobile itself. See, *e.g., Pennsylvania* v. *Labron*, 518 U. S. 938, 940 (1996) (*per curiam*) (explaining that the automobile exception "permits police to search the vehicle"); *Wyoming* v. *Houghton*, 526 U. S. 295, 300 (1999) ("[T]he Framers would have regarded as reasonable (if there was probable cause) the warrantless search of containers *within* an automobile"). Virginia asks the Court to expand the scope of the automobile exception to permit police to invade any space outside an automobile even if the Fourth Amendment protects that space. Nothing in our case law, however, suggests that the automobile exception gives an officer the right to enter a home or its curtilage to access a vehicle

————————

[2] Helpfully, the parties have simplified matters somewhat by each making a concession. Petitioner concedes "for purposes of this appeal" that Officer Rhodes had probable cause to believe that the motorcycle was the one that had eluded him, Brief for Petitioner 5, n. 3, and Virginia concedes that "Officer Rhodes searched the motorcycle," Brief for Respondent 12.

without a warrant.  Expanding the scope of the automobile exception in this way would both undervalue the core Fourth Amendment protection afforded to the home and its curtilage and "'untether'" the automobile exception "'from the justifications underlying'" it.  *Riley* v. *California*, 573 U. S. ___, ___ (2014) (slip op., at 10) (quoting *Arizona* v. *Gant*, 556 U. S. 332, 343 (2009)).

The Court already has declined to expand the scope of other exceptions to the warrant requirement to permit warrantless entry into the home.  The reasoning behind those decisions applies equally well in this context.  For instance, under the plain-view doctrine, "any valid warrantless seizure of incriminating evidence" requires that the officer "have a lawful right of access to the object itself."  *Horton* v. *California*, 496 U. S. 128, 136–137 (1990); see also *id.,* at 137, n. 7 ("'[E]ven where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure'"); *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 354 (1977) ("It is one thing to seize without a warrant property resting in an open area . . . , and it is quite another thing to effect a warrantless seizure of property . . . situated on private premises to which access is not otherwise available for the seizing officer").  A plain-view seizure thus cannot be justified if it is effectuated "by unlawful trespass."  *Soldal* v. *Cook County*, 506 U. S. 56, 66 (1992).  Had Officer Rhodes seen illegal drugs through the window of Collins' house, for example, assuming no other warrant exception applied, he could not have entered the house to seize them without first obtaining a warrant.

Similarly, it is a "settled rule that warrantless arrests in public places are valid," but, absent another exception such as exigent circumstances, officers may not enter a home to make an arrest without a warrant, even when they have probable cause.  *Payton* v. *New York*, 445 U. S.

573, 587–590 (1980). That is because being "'arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home.'" *Id.*, at 588–589 (quoting *United States* v. *Reed*, 572 F. 2d 412, 423 (CA2 1978)). Likewise, searching a vehicle parked in the curtilage involves not only the invasion of the Fourth Amendment interest in the vehicle but also an invasion of the sanctity of the curtilage.

Just as an officer must have a lawful right of access to any contraband he discovers in plain view in order to seize it without a warrant, and just as an officer must have a lawful right of access in order to arrest a person in his home, so, too, an officer must have a lawful right of access to a vehicle in order to search it pursuant to the automobile exception. The automobile exception does not afford the necessary lawful right of access to search a vehicle parked within a home or its curtilage because it does not justify an intrusion on a person's separate and substantial Fourth Amendment interest in his home and curtilage.

As noted, the rationales underlying the automobile exception are specific to the nature of a vehicle and the ways in which it is distinct from a house. See Part II–A–1, *supra*. The rationales thus take account only of the balance between the intrusion on an individual's Fourth Amendment interest in his vehicle and the governmental interests in an expedient search of that vehicle; they do not account for the distinct privacy interest in one's home or curtilage. To allow an officer to rely on the automobile exception to gain entry into a house or its curtilage for the purpose of conducting a vehicle search would unmoor the exception from its justifications, render hollow the core Fourth Amendment protection the Constitution extends to the house and its curtilage, and transform what was meant to be an exception into a tool with far broader application. Indeed, its name alone should make all this

clear enough: It is, after all, an exception for automobiles.[3]

——————

[3] The dissent concedes that "the degree of the intrusion on privacy" is relevant in determining whether a warrant is required to search a motor vehicle "located on private property." *Post*, at 5–6 (opinion of ALITO, J.). Yet it puzzlingly asserts that the "privacy interests at stake" here are no greater than when a motor vehicle is searched "on public streets." *Post,* at 3–4. "An ordinary person of common sense," *post,* at 2, however, clearly would understand that the privacy interests at stake in one's private residential property are far greater than on a public street. Contrary to the dissent's suggestion, it is of no significance that the motorcycle was parked just a "short walk up the driveway." *Ibid.* The driveway was private, not public, property, and the motorcycle was parked in the portion of the driveway beyond where a neighbor would venture, in an area "intimately linked to the home, . . . where privacy expectations are most heightened." *California* v. *Ciraolo*, 476 U. S. 207, 213 (1986). Nor does it matter that Officer Rhodes "did not damage any property," *post*, at 2, for an officer's care in conducting a search does not change the character of the place being searched. And, as we explain, see *infra*, at 13–14, it is not dispositive that Officer Rhodes did not "observe anything along the way" to the motorcycle "that he could not have seen from the street," *post,* at 2. Law enforcement officers need not "shield their eyes when passing by a home on public thoroughfares," *Ciraolo*, 476 U. S., at 213, but the ability visually to observe an area protected by the Fourth Amendment does not give officers the green light physically to intrude on it. See *Florida* v. *Jardines*, 569 U. S. 1, 7–8 (2013). It certainly does not permit an officer physically to intrude on curtilage, remove a tarp to reveal license plate and vehicle identification numbers, and use those numbers to confirm that the defendant committed a crime.

The dissent also mistakenly relies on a law enacted by the First Congress and mentioned in *Carroll* v. *United States*, 267 U. S. 132, 150–151 (1925), that authorized the warrantless search of vessels. *Post*, at 4–5, n. 3. The dissent thinks it implicit in that statute that "officers could cross private property such as wharves in order to reach and board those vessels." *Ibid.* Even if it were so that a police officer could have entered a private wharf to search a vessel, that would not prove he could enter the curtilage of a home to do so. To the contrary, whereas the statute relied upon in *Carroll* authorized warrantless searches of vessels, it expressly required warrants to search houses. See 267 U. S., at 150–157; Act of July 31, 1789, §24, 1 Stat. 43. Here, Officer Rhodes did not invade a private wharf to undertake a search; he invaded the curtilage of a home.

Given the centrality of the Fourth Amendment interest in the home and its curtilage and the disconnect between that interest and the justifications behind the automobile exception, we decline Virginia's invitation to extend the automobile exception to permit a warrantless intrusion on a home or its curtilage.

## III
### A

Virginia argues that this Court's precedent indicates that the automobile exception is a categorical one that permits the warrantless search of a vehicle anytime, anywhere, including in a home or curtilage. Specifically, Virginia points to two decisions that it contends resolve this case in its favor. Neither is dispositive or persuasive.

First, Virginia invokes *Scher* v. *United States*, 305 U. S. 251 (1938). In that case, federal officers received a confidential tip that a particular car would be transporting bootleg liquor at a specified time and place. The officers identified and followed the car until the driver "turned into a garage a few feet back of his residence and within the curtilage." *Id.,* at 253. As the driver exited his car, an officer approached and stated that he had been informed that the car was carrying contraband. The driver acknowledged that there was liquor in the trunk, and the officer proceeded to open the trunk, find the liquor, arrest the driver, and seize both the car and the liquor. *Id.,* at 253–254. Although the officer did not have a search warrant, the Court upheld the officer's actions as reasonable. *Id.,* at 255.

*Scher* is inapposite. Whereas Collins' motorcycle was parked and unattended when Officer Rhodes intruded on the curtilage to search it, the officers in *Scher* first encountered the vehicle when it was being driven on public streets, approached the curtilage of the home only when the driver turned into the garage, and searched the vehicle

only after the driver admitted that it contained contraband. *Scher* by no means established a general rule that the automobile exception permits officers to enter a home or its curtilage absent a warrant. The Court's brief analysis referenced *Carroll*, but only in the context of observing that, consistent with that case, the "officers properly could have stopped" and searched the car "just before [petitioner] entered the garage," a proposition the petitioner did "not seriously controvert." *Scher,* 305 U. S., at 254–255. The Court then explained that the officers did not lose their ability to stop and search the car when it entered "the open garage closely followed by the observing officer" because "[n]o search was made of the garage." *Id.,* at 255. It emphasized that "[e]xamination of the automobile accompanied an arrest, without objection and upon admission of probable guilt," and cited two search-incident-to-arrest cases. *Ibid.* (citing *Agnello* v. *United States*, 269 U. S. 20, 30 (1925); *Wisniewski* v. *United States*, 47 F. 2d 825, 826 (CA6 1931)). *Scher*'s reasoning thus was both case specific and imprecise, sounding in multiple doctrines, particularly, and perhaps most appropriately, hot pursuit. The decision is best regarded as a factbound one, and it certainly does not control this case.

Second, Virginia points to *Labron*, 518 U. S. 938, where the Court upheld under the automobile exception the warrantless search of an individual's pickup truck that was parked in the driveway of his father-in-law's farmhouse. *Id.,* at 939–940; *Commonwealth* v. *Kilgore*, 544 Pa. 439, 444, 677 A. 2d 311, 313 (1995). But *Labron* provides scant support for Virginia's position. Unlike in this case, there was no indication that the individual who owned the truck in *Labron* had any Fourth Amendment interest in the farmhouse or its driveway, nor was there a determination that the driveway was curtilage.

## B

Alternatively, Virginia urges the Court to adopt a more limited rule regarding the intersection of the automobile exception and the protection afforded to curtilage. Virginia would prefer that the Court draw a bright line and hold that the automobile exception does not permit warrantless entry into "the physical threshold of a house or a similar fixed, enclosed structure inside the curtilage like a garage." Brief for Respondent 46. Requiring officers to make "case-by-case curtilage determinations," Virginia reasons, unnecessarily complicates matters and "raises the potential for confusion and . . . error." *Id.,* at 46–47 (internal quotation marks omitted).

The Court, though, has long been clear that curtilage is afforded constitutional protection. See *Oliver*, 466 U. S., at 180. As a result, officers regularly assess whether an area is curtilage before executing a search. Virginia provides no reason to conclude that this practice has proved to be unadministrable, either generally or in this context. Moreover, creating a carveout to the general rule that curtilage receives Fourth Amendment protection, such that certain types of curtilage would receive Fourth Amendment protection only for some purposes but not for others, seems far more likely to create confusion than does uniform application of the Court's doctrine.

In addition, Virginia's proposed rule rests on a mistaken premise about the constitutional significance of visibility. The ability to observe inside curtilage from a lawful vantage point is not the same as the right to enter curtilage without a warrant for the purpose of conducting a search to obtain information not otherwise accessible. Cf. *Ciraolo*, 476 U. S., at 213–214 (holding that "physically nonintrusive" warrantless aerial observation of the curtilage of a home did not violate the Fourth Amendment, and could form the basis for probable cause to support a warrant to search the curtilage). So long as it is curtilage, a

parking patio or carport into which an officer can see from the street is no less entitled to protection from trespass and a warrantless search than a fully enclosed garage.

Finally, Virginia's proposed bright-line rule automatically would grant constitutional rights to those persons with the financial means to afford residences with garages in which to store their vehicles but deprive those persons without such resources of any individualized consideration as to whether the areas in which they store their vehicles qualify as curtilage. See *United States* v. *Ross*, 456 U. S. 798, 822 (1982) ("[T]he most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion").

## IV

For the foregoing reasons, we conclude that the automobile exception does not permit an officer without a warrant to enter a home or its curtilage in order to search a vehicle therein. We leave for resolution on remand whether Officer Rhodes' warrantless intrusion on the curtilage of Collins' house may have been reasonable on a different basis, such as the exigent circumstances exception to the warrant requirement. The judgment of the Supreme Court of Virginia is therefore reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 16–1027

———————

## RYAN AUSTIN COLLINS, PETITIONER *v.* VIRGINIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
VIRGINIA

[May 29, 2018]

JUSTICE THOMAS, concurring.

I join the Court's opinion because it correctly resolves the Fourth Amendment question in this case. Notably, the only reason that Collins asked us to review this question is because, if he can prove a violation of the Fourth Amendment, our precedents require the Virginia courts to apply the exclusionary rule and potentially suppress the incriminating evidence against him. I write separately because I have serious doubts about this Court's authority to impose that rule on the States. The assumption that state courts must apply the federal exclusionary rule is legally dubious, and many jurists have complained that it encourages "distort[ions]" in substantive Fourth Amendment law, *Rakas* v. *Illinois*, 439 U. S. 128, 157 (1978) (White, J., dissenting); see also *Coolidge* v. *New Hampshire*, 403 U. S. 443, 490 (1971) (Harlan, J., concurring); Calabresi, The Exclusionary Rule, 26 Harv. J. L. & Pub. Pol'y 111, 112 (2003).

The Fourth Amendment, as relevant here, protects the people from "unreasonable searches" of "their . . . houses." As a general rule, warrantless searches of the curtilage violate this command. At the founding, curtilage was considered part of the "hous[e]" itself. See 4 W. Blackstone, Commentaries on the Laws of England 225 (1769) ("[T]he capital house protects and privileges all its branches and appurtenants, if within the curtilage"). And

except in circumstances not present here, house searches required a specific warrant. See W. Cuddihy, The Fourth Amendment: Origins and Original Meaning 602–1791, p. 743 (2009) (Cuddihy); Donahue, The Original Fourth Amendment, 83 U. Chi. L. Rev. 1181, 1237–1240 (2016); Davies, Recovering the Original Fourth Amendment, 98 Mich. L. Rev. 547, 643–646 (1999). A warrant was required even if the house was being searched for stolen goods or contraband—objects that, unlike cars, are not protected by the Fourth Amendment at all. *Id.,* at 647–650; see also *Carroll* v. *United States*, 267 U. S. 132, 150–152 (1925) (Taft, C. J.) (discussing founding-era evidence that a search warrant was required when stolen goods and contraband were "concealed in a dwelling house" but not when they were "in course of transportation and concealed in a movable vessel"). Accordingly, the police acted "unreasonabl[y]" when they searched the curtilage of Collins' house without a warrant.[1]

While those who ratified the Fourth and Fourteenth Amendments would agree that a constitutional violation occurred here, they would be deeply confused about the posture of this case and the remedy that Collins is seeking. Historically, the only remedies for unconstitutional searches and seizures were "tort suits" and "self-help." *Utah* v. *Strieff*, 579 U. S. ___, ___ (2016) (slip op., at 4). The exclusionary rule—the practice of deterring illegal searches and seizures by suppressing evidence at criminal trials—did not exist. No such rule existed in "Roman Law, Napoleonic Law or even the Common Law of England." Burger, Who Will Watch the Watchman? 14 Am. U. L. Rev. 1 (1964). And this Court did not adopt the federal

─────────

[1] Collins did not live at the house; he merely stayed there with his girlfriend several times a week. But Virginia does not contest Collins' assertion that the house is his, so I agree with the Court that Virginia has forfeited any argument to the contrary. See *ante,* at 2, n. 1; *United States* v. *Jones*, 565 U. S. 400, 404, n. 2 (2012).

exclusionary rule until the 20th century. See *Weeks* v. *United States*, 232 U. S. 383 (1914). As late as 1949, nearly two-thirds of the States did not have an exclusionary rule. See *Wolf* v. *Colorado*, 338 U. S. 25, 29 (1949). Those States, as then-Judge Cardozo famously explained, did not understand the logic of a rule that allowed "[t]he criminal . . . to go free because the constable has blundered." *People* v. *Defore*, 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926).

The Founders would not have understood the logic of the exclusionary rule either. Historically, if evidence was relevant and reliable, its admissibility did not "depend upon the lawfulness or unlawfulness of the mode, by which it [was] obtained." *United States* v. *The La Jeune Eugenie*, 26 F. Cas. 832, 843 (No. 15, 551) (CC Mass. 1822) (Story, J.); accord, 1 S. Greenleaf, Evidence §254a, pp. 825–826 (14th ed. 1883) ("[T]hat . . . subjects of evidence may have been . . . unlawfully obtained . . . is no valid objection to their admissibility if they are pertinent to the issue"); 4 J. Wigmore, Evidence §2183, p. 626 (2d ed. 1923) ("[I]t has long been established that the admissibility of evidence is not affected by the illegality of the means through which the party has been enabled to obtain the evidence" (emphasis deleted)). And the common law sometimes reflected the inverse of the exclusionary rule: The fact that someone turned out to be guilty could *justify* an illegal seizure. See *Gelston* v. *Hoyt*, 3 Wheat. 246, 310 (1818) (Story, J.) ("At common law, any person may at his peril, seize for a forfeiture to the government; and if the government adopt his seizure, and the property is condemned, he will be completely justified"); 2 W. Hawkins, Pleas of the Crown 77 (1721) ("And where a Man arrests another, who is actually guilty of the Crime for which he is arrested, . . . he needs not in justifying it, set forth any special Cause of his Suspicion").

Despite this history, the Court concluded in *Mapp* v.

*Ohio*, 367 U. S. 643 (1961), that the States must apply the federal exclusionary rule in their own courts. *Id.,* at 655.[2] *Mapp* suggested that the exclusionary rule was required by the Constitution itself. See, *e.g., id.,* at 657 ("[T]he exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments"); *id.,* at 655 ("[E]vidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court"); *id.,* at 655–656 ("[I]t was . . . constitutionally necessary that the exclusion doctrine—an essential part of the right to privacy—be also insisted upon").[3]  But that suggestion could not withstand even the slightest scrutiny. The exclusionary rule appears nowhere in the Constitution, postdates the founding by more than a century, and contradicts several longstanding principles of the common law. See *supra,* at 2–3; Cuddihy 759–760; Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 786 (1994); Kaplan, The Limits of the Exclusionary Rule, 26

_____

[2] Twelve years before *Mapp*, the Court declined to apply the federal exclusionary rule to the States.  See *Wolf* v. *Colorado*, 338 U. S. 25 (1949).  *Wolf* denied that the Constitution requires the exclusionary rule, since "most of the English-speaking world" does not apply that rule and alternatives such as civil suits and internal police discipline do not "fal[l] below the minimal standards assured by the Due Process Clause." *Id.,* at 29, 31.  In *Mapp*, the Court overruled *Wolf* and applied the exclusionary rule to the States, even though no party had briefed or argued that question.  See 367 U. S., at 672–674, and nn. 4–6 (Harlan, J., dissenting); Stewart, The Road to *Mapp* v. *Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule, 83 Colum. L. Rev. 1365, 1368 (1983).

[3] Justice Black, the essential fifth vote in *Mapp*, did not agree that the Fourth Amendment contains an exclusionary rule.  See 367 U. S., at 661–662 (concurring opinion) ("[T]he Fourth Amendment does not itself contain any provision expressly precluding the use of such evidence, and I am extremely doubtful that such a provision could properly be inferred").  But he concluded that, when the police seize private papers, suppression is required by a combination of the Fourth and Fifth Amendments.  See *id.,* at 662–666.

Stan. L. Rev. 1027, 1030–1031 (1974).

Recognizing this, the Court has since rejected *Mapp*'s "'[e]xpansive dicta'" and clarified that the exclusionary rule is not required by the Constitution. *Davis* v. *United States*, 564 U. S. 229, 237 (2011) (quoting *Hudson* v. *Michigan*, 547 U. S. 586, 591 (2006)). Suppression, this Court has explained, is not "a personal constitutional right." *United States* v. *Calandra*, 414 U. S. 338, 348 (1974); accord, *Stone* v. *Powell*, 428 U. S. 465, 486 (1976). The Fourth Amendment "says nothing about suppressing evidence," *Davis*, *supra*, at 236, and a prosecutor's "use of fruits of a past unlawful search or seizure 'work[s] no new Fourth Amendment wrong,'" *United States* v. *Leon*, 468 U. S. 897, 906 (1984) (quoting *Calandra, supra*, at 354).[4] Instead, the exclusionary rule is a "judicially created" doctrine that is "prudential rather than constitutionally mandated." *Pennsylvania Bd. of Probation and Parole* v. *Scott*, 524 U. S. 357, 363 (1998); accord, *Herring* v. *United States*, 555 U. S. 135, 139 (2009); *Arizona* v. *Evans*, 514 U. S. 1, 10 (1995); *United States* v. *Janis*, 428 U. S. 433, 459–460 (1976).[5]

————————

[4] The exclusionary rule is not required by the Due Process Clause either. Given its nonexistent historical foundation, the exclusionary rule cannot be a "settled usag[e] and mod[e] of proceeding existing in the common and statute law of England, before the emigration of our ancestors." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 277 (1856). And the rule "has 'no bearing on . . . the fairness of the trial.'" *Desist* v. *United States*, 394 U. S. 244, 254, n. 24 (1969). If anything, the exclusionary rule itself "'offends basic concepts of the criminal justice system'" and exacts a "'costly toll upon truth-seeking.'" *Herring* v. *United States*, 555 U. S. 135, 141 (2009). "The [excluded] evidence is likely to be the most reliable that could possibly be obtained [and thus] exclusion rather than admission creates the danger of a verdict erroneous on the true facts." H. Friendly, Benchmarks 260 (1967).

[5] These statements cannot be dismissed as mere dicta. Cf. *Dickerson* v. *United States*, 530 U. S. 428, 438–441, and n. 2 (2000) (constitutionalizing the rule announced in *Miranda* v. *Arizona*, 384 U. S. 436 (1966),

Although the exclusionary rule is not part of the Constitution, this Court has continued to describe it as "federal law" and assume that it applies to the States. *Evans*, *supra*; *Massachusetts* v. *Sheppard*, 468 U. S. 981, 991 (1984). Yet the Court has never attempted to justify this assumption. If the exclusionary rule is federal law, but is not grounded in the Constitution or a federal statute, then it must be federal common law. See Monaghan, Foreword: Constitutional Common Law, 89 Harv. L. Rev. 1, 10 (1975). As federal common law, however, the exclusionary rule cannot bind the States.

Federal law trumps state law only by virtue of the Supremacy Clause, which makes the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties . . . the supreme Law of the Land," Art. VI, cl. 2. When the Supremacy Clause refers to "[t]he Laws of the United States made in Pursuance [of the Constitution]," it means federal statutes, not federal common law. Ramsey, The Supremacy Clause, Original Meaning, and Modern Law, 74 Ohio St. L. J. 559, 572–599 (2013) (Ramsey); Clark, Separation of Powers as a Safeguard of Federalism, 79 Texas L. Rev. 1321, 1334–1336, 1338–1367 (2001) (Clark); see also *Gibbons* v. *Ogden*, 9 Wheat. 1, 211 (1824) (Marshall, C. J.) ("The appropriate application of that part of the clause which confers . . . supremacy on laws . . . is to . . . the laws of Congress, made in pursuance of the constitution"); Hart, The Relations

_____

despite earlier precedents to the contrary). The nonconstitutional status of the exclusionary rule is why this Court held in *Stone* v. *Powell*, 428 U. S. 465, 482–495 (1976), that violations are not cognizable on federal habeas review. Cf. *Dickerson*, *supra*, at 439 n. 3. And the nonconstitutional status of the rule is why this Court has created more than a dozen exceptions to it, which apply even when the Fourth Amendment is concededly violated. See *United States* v. *Weaver*, 808 F. 3d 26, 49 (CADC 2015) (Henderson, J., dissenting) (collecting cases); cf. *Dickerson*, *supra*, at 441.

Between State and Federal Law, 54 Colum. L. Rev. 489, 500 (1954) ("[T]he supremacy clause is limited to those 'Laws' of the United States which are passed by Congress pursuant to the Constitution"). By referencing laws "made in Pursuance" of the Constitution, the Supremacy Clause incorporates the requirements of Article I, which force Congress to stay within its enumerated powers, §8, and follow the cumbersome procedures for enacting federal legislation, §7. See *Wyeth* v. *Levine*, 555 U. S. 555, 585–587 (2009) (THOMAS, J., concurring in judgment); 3 J. Story, Commentaries on the Constitution of the United States §1831, pp. 693–694 (1833); Clark 1334. Those procedures—especially the requirement that bills pass the Senate, where the States are represented equally and Senators were originally elected by state legislatures— safeguard federalism by making federal legislation more difficult to pass and more responsive to state interests. See Ramsey 565; Clark 1342–1343. Federal common law bypasses these procedures and would not have been considered the kind of "la[w]" that can bind the States under the Supremacy Clause. See Ramsey 564–565, 568, 574, 581; Jay, Origins of Federal Common Law: Part Two, 133 U. Pa. L. Rev. 1231, 1275 (1985).

True, this Court, without citing the Supremacy Clause, has recognized several "enclaves of federal judge-made law which bind the States." *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 426 (1964); see, *e.g., id.,* at 427–428 (foreign affairs); *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.*, 304 U. S. 92, 110 (1938) (disputes between States); *Garrett* v. *Moore-McCormack Co.*, 317 U. S. 239, 245 (1942) (admiralty); *Clearfield Trust Co.* v. *United States*, 318 U. S. 363, 366 (1943) (certain rights and obligations of the United States); *Textile Workers* v. *Lincoln Mills of Ala.*, 353 U. S. 448, 456–457 (1957) (aspects of federal labor law). To the extent these enclaves are delegations of lawmaking authority from the Constitution or a

federal statute, they do not conflict with the original meaning of the Supremacy Clause (though they might be illegitimate for other reasons). See Ramsey 568–569; Grano, Prophylactic Rules in Criminal Procedure: A Question of Article III Legitimacy, 80 Nw. U. L. Rev. 100, 131–132 (1985). To the extent these enclaves are not rooted in the Constitution or a statute, their pre-emptive force is questionable. But that is why this Court has "limited" them to a "'few'" "narrow areas" where "the authority and duties of the United States as sovereign are intimately involved" or where "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 640–641 (1981) (quoting *Wheeldin* v. *Wheeler*, 373 U. S. 647, 651 (1963)). Outside these narrow enclaves, the general rule is that "[t]here is no federal general common law" and "[e]xcept in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State." *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 78 (1938).

These precedents do not support requiring the States to apply the exclusionary rule. As explained, the exclusionary rule is not rooted in the Constitution or a federal statute. This Court has repeatedly rejected the idea that the rule is in the Fourth and Fourteenth Amendments, expressly or implicitly. See *Davis*, 564 U. S., at 236; *Leon*, 468 U. S., at 905–906; cf. *Ziglar* v. *Abbasi*, 582 U. S. ___, ___ (2017) (slip op., at 11) (explaining that reading implied remedies into the Constitution is "a 'disfavored' judicial activity"). And the exclusionary rule does not implicate any of the special enclaves of federal common law. It does not govern the sovereign duties of the United States or disputes of an interstate or international character. Instead, the rule governs the methods that state police officers use to solve crime and the procedures that state courts use at criminal trials—subjects that the Federal

Government generally has no power to regulate. See *United States* v. *Morrison*, 529 U. S. 598, 618 (2000) (explaining that "[t]he regulation" and "vindication" of intrastate crime "has always been the province of the States"); *Smith* v. *Phillips*, 455 U. S. 209, 221 (1982) ("Federal courts hold no supervisory authority over state judicial proceedings"). These are not areas where federal common law can bind the States.[6]

\*    \*    \*

In sum, I am skeptical of this Court's authority to impose the exclusionary rule on the States. We have not yet revisited that question in light of our modern precedents, which reject *Mapp*'s essential premise that the exclusionary rule is required by the Constitution. We should do so.

---

[6] Of course, the States are free to adopt their own exclusionary rules as a matter of state law. But nothing in the Federal Constitution requires them to do so. Even assuming the Constitution requires particular state-law remedies for federal constitutional violations, it does not require the exclusionary rule. The "sole purpose" of the exclusionary rule is "to deter future Fourth Amendment violations"; it does not "'redress'" or "'repair'" past ones. *Davis* v. *United States*, 564 U. S. 229, 236–237 (2011). This Court has noted the lack of evidence supporting its deterrent effect, see *United States* v. *Janis*, 428 U. S. 433, 450, n. 22 (1976), and this Court has recognized the effectiveness of alternative deterrents such as state tort law, state criminal law, internal police discipline, and suits under 42 U. S. C. §1983, see *Hudson* v. *Michigan*, 547 U. S. 586, 597–599 (2006).

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1027

_____

## RYAN AUSTIN COLLINS, PETITIONER *v.* VIRGINIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
VIRGINIA

[May 29, 2018]

JUSTICE ALITO, dissenting.

The Fourth Amendment prohibits "unreasonable" searches. What the police did in this case was entirely reasonable. The Court's decision is not.

On the day in question, Officer David Rhodes was standing at the curb of a house where petitioner, Ryan Austin Collins, stayed a couple of nights a week with his girlfriend. From his vantage point on the street, Rhodes saw an object covered with a tarp in the driveway, just a car's length or two from the curb. It is undisputed that Rhodes had probable cause to believe that the object under the tarp was a motorcycle that had been involved a few months earlier in a dangerous highway chase, eluding the police at speeds in excess of 140 mph. See Tr. of Oral Arg. 22; App. to Pet. for Cert. 67. Rhodes also had probable cause to believe that petitioner had been operating the motorcycle[1] and that a search of the motorcycle would provide evidence that the motorcycle had been stolen.[2]

If the motorcycle had been parked at the curb, instead of in the driveway, it is undisputed that Rhodes could have

_____

[1] Petitioner had a photo on his Facebook profile of a motorcycle that resembled the unusual motorcycle involved in the prior highway chase. See *ante,* at 1–2 (majority opinion).

[2] Rhodes suspected the motorcycle was stolen based on a conversation he had with the man who had sold the motorcycle to petitioner. See App. 57–58.

searched it without obtaining a warrant. See Tr. of Oral Arg. 9; Reply Brief 1. Nearly a century ago, this Court held that officers with probable cause may search a motor vehicle without obtaining a warrant. *Carroll* v. *United States*, 267 U. S. 132, 153, 155–156 (1925). The principal rationale for this so-called automobile or motor-vehicle exception to the warrant requirement is the risk that the vehicle will be moved during the time it takes to obtain a warrant. *Id.*, at 153; *California* v. *Carney*, 471 U. S. 386, 390–391 (1985). We have also observed that the owner of an automobile has a diminished expectation of privacy in its contents. *Id.*, at 391–393.

So why does the Court come to the conclusion that Officer Rhodes needed a warrant in this case? Because, in order to reach the motorcycle, he had to walk 30 feet or so up the driveway of the house rented by petitioner's girl-friend, and by doing that, Rhodes invaded the home's "curtilage." *Ante*, at 6–7. The Court does not dispute that the motorcycle, when parked in the driveway, was just as mobile as it would have been had it been parked at the curb. Nor does the Court claim that Officer Rhodes's short walk up the driveway did petitioner or his girlfriend any harm. Rhodes did not damage any property or observe anything along the way that he could not have seen from the street. But, the Court insists, Rhodes could not enter the driveway without a warrant, and therefore his search of the motorcycle was unreasonable and the evidence obtained in that search must be suppressed.

An ordinary person of common sense would react to the Court's decision the way Mr. Bumble famously responded when told about a legal rule that did not comport with the reality of everyday life. If that is the law, he exclaimed, "the law is a ass—a idiot." C. Dickens, Oliver Twist 277 (1867).

The Fourth Amendment is neither an "ass" nor an "idiot." Its hallmark is reasonableness, and the Court's strikingly

unreasonable decision is based on a misunderstanding of Fourth Amendment basics.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects." A "house," for Fourth Amendment purposes, is not limited to the structure in which a person lives, but by the same token, it also does not include all the real property surrounding a dwelling. See, *e.g.*, *Florida* v. *Jardines*, 569 U. S. 1, 6 (2013); *United States* v. *Dunn*, 480 U. S. 294, 300–301 (1987). Instead, a person's "house" encompasses the dwelling and a circumscribed area of surrounding land that is given the name "curtilage." *Oliver* v. *United States*, 466 U. S. 170, 180 (1984). Land outside the curtilage is called an "open field," and a search conducted in that area is not considered a search of a "house" and is therefore not governed by the Fourth Amendment. *Ibid.* Ascertaining the boundaries of the curtilage thus determines only whether a search is governed by the Fourth Amendment. The concept plays no other role in Fourth Amendment analysis.

In this case, there is no dispute that the search of the motorcycle was governed by the Fourth Amendment, and therefore whether or not it occurred within the curtilage is not of any direct importance. The question before us is not whether there was a Fourth Amendment search but whether the search was reasonable. And the only possible argument as to why it might not be reasonable concerns the need for a warrant. For nearly a century, however, it has been well established that officers do not need a warrant to search a motor vehicle on public streets so long as they have probable cause. *Carroll*, *supra*, at 153, 156; see also, *e.g.*, *Pennsylvania* v. *Labron*, 518 U. S. 938, 940 (1996) (*per curiam*); *Carney*, *supra*, at 394; *South Dakota* v. *Opperman*, 428 U. S. 364, 367–368 (1976); *Chambers* v. *Maroney*, 399 U. S. 42, 50–51 (1970). Thus, the issue here is whether there is any good reason why this same rule

should not apply when the vehicle is parked in plain view in a driveway just a few feet from the street.

In considering that question, we should ask whether the reasons for the "automobile exception" are any less valid in this new situation. Is the vehicle parked in the driveway any less mobile? Are any greater privacy interests at stake? If the answer to those questions is "no," then the automobile exception should apply. And here, the answer to each question is emphatically "no." The tarp-covered motorcycle parked in the driveway could have been uncovered and ridden away in a matter of seconds. And Officer Rhodes's brief walk up the driveway impaired no real privacy interests.

In this case, the Court uses the curtilage concept in a way that is contrary to our decisions regarding other, exigency-based exceptions to the warrant requirement. Take, for example, the "emergency aid" exception. See *Brigham City* v. *Stuart*, 547 U. S. 398 (2006). When officers reasonably believe that a person inside a dwelling has urgent need of assistance, they may cross the curtilage and enter the building without first obtaining a warrant. *Id.*, at 403–404. The same is true when officers reasonably believe that a person in a dwelling is destroying evidence. See *Kentucky* v. *King*, 563 U. S. 452, 460 (2011). In both of those situations, we ask whether "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." *Brigham City*, *supra*, at 403 (quoting *Mincey* v. *Arizona*, 437 U. S. 385, 394 (1978)). We have not held that the need to cross the curtilage independently necessitates a warrant, and there is no good reason to apply a different rule here.[3]

————————

[3] Indeed, I believe that the First Congress implicitly made the same judgment in enacting the statute on which *Carroll* v. *United States*, 267 U. S. 132 (1925), relied when the motor-vehicle exception was first

It is no answer to this argument that the emergency-aid and destruction-of-evidence exceptions require an inquiry into the practicality of obtaining a warrant in the particular circumstances of the case. Our precedents firmly establish that the motor-vehicle exception, unlike these other exceptions, "has no separate exigency requirement." *Maryland* v. *Dyson*, 527 U. S. 465, 466–467 (1999) (*per curiam*). It is settled that the mobility of a motor vehicle categorically obviates any need to engage in such a case-specific inquiry. Requiring such an inquiry here would mark a substantial alteration of settled Fourth Amendment law.

This does not mean, however, that a warrant is never needed when officers have probable cause to search a motor vehicle, no matter where the vehicle is located. While a case-specific inquiry regarding *exigency* would be inconsistent with the rationale of the motor-vehicle exception, a case-specific inquiry regarding *the degree of intrusion on privacy* is entirely appropriate when the motor vehicle to be searched is located on private property. After all, the ultimate inquiry under the Fourth Amendment is

_____

recognized. Since the First Congress sent the Bill of Rights to the States for ratification, we have often looked to laws enacted by that Congress as evidence of the original understanding of the meaning of those Amendments. See, *e.g.*, *id.*, at 150–151; *Town of Greece* v. *Galloway*, 572 U. S. \_\_\_, \_\_\_–\_\_\_ (2014) (slip op., at 7–8); *United States* v. *Villamonte-Marquez*, 462 U. S. 579, 585–586 (1983); *United States* v. *Ramsey*, 431 U. S. 606, 616–617 (1977). *Carroll* itself noted that the First Congress enacted a law authorizing officers to search vessels without a warrant. 267 U. S., at 150–151. Although this statute did not expressly state that these officers could cross private property such as wharves in order to reach and board those vessels, I think that was implicit. Otherwise, the statute would very often have been ineffective. And when Congress later enacted similar laws, it made this authorization express. See, *e.g.*, An Act Further to Prevent Smuggling and for Other Purposes, §5, 14 Stat. 179. For this reason, Officer Rhodes's conduct in this case is consistent with the original understanding of the Fourth Amendment, as explicated in *Carroll*.

whether a search is reasonable, and that inquiry often turns on the degree of the intrusion on privacy. Thus, contrary to the opinion of the Court, an affirmance in this case would not mean that officers could perform a warrantless search if a motorcycle were located inside a house. See *ante*, at 7. In that situation, the intrusion on privacy would be far greater than in the present case, where the real effect, if any, is negligible.

I would affirm the decision below and therefore respectfully dissent.