In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1312
UNITED STATES OF AMERICA,
 Plaintiff-Appellee,
 v.

JEREMY D. BANKS,
 Defendant-Appellant.
 ____________________

 Appeal from the United States District Court for the
 Central District of Illinois.
 No. 3:21-CR-30032 — Sue E. Myerscough, Judge.
 ____________________

 ARGUED DECEMBER 14, 2022 — DECIDED FEBRUARY 13, 2023
 ____________________

 Before SYKES, Chief Judge, and SCUDDER and LEE, Circuit
Judges.
 SCUDDER, Circuit Judge. In April 2021 the Springfield, Illi-
nois police saw a Snapchat post of Jeremy Banks barbequing
on his front porch with a gun sitting on the grill’s side shelf.
Because Banks was a convicted felon, the officers needed
nothing more to request a warrant to arrest him for unlawful
gun possession. But they skipped this step and instead pro-
ceeded to Banks’s home, walked onto his porch, and, after a
2 No. 22-1312

tussle, arrested him in his family room. The Fourth Amend-
ment did not permit the shortcut, as the Supreme Court has
held in no uncertain terms that a front porch—part of a
home’s so-called curtilage—receives the same protection as
the home itself. And no exception to the warrant requirement
saves the officers’ actions here. We therefore reverse the dis-
trict court’s denial of Banks’s motion to suppress.
 I
 Jeremy Banks posted the video of the gun within arm’s
reach on the evening of April 8, 2021. Colton Redding, a
Springfield police officer, saw the post, recognized Banks’s
voice, and knew him to be a convicted felon. Officer Redding
gathered a group of colleagues and, within minutes of seeing
the video, headed to Banks’s home.
 Upon arriving the officers saw Banks exactly where they
expected to—on his porch, next to the grill. A few officers
went around the back side of the house and, to avoid detec-
tion, approached the porch by walking through the backyard.
The plan worked and resulted in the officers catching Banks
by surprise, struggling with him, and eventually arresting
him in the front room of the house. A pat down turned up a
loaded 9mm semi-automatic pistol in Banks’s pocket. The of-
ficers also saw a box of 9mm rounds in the same room. The
police did not have a warrant to enter Banks’s porch or to
search his home.
 Federal criminal charges followed for the unlawful gun
possession. See 18 U.S.C. § 922(g)(1). For his part, Banks re-
sponded by moving to suppress the police’s recovery of the
gun and ammunition found in his home, arguing that the of-
ficers needed a warrant to enter his porch and arrest him.
No. 22-1312 3

 At an evidentiary hearing before a magistrate judge, Of-
ficer Redding and Sergeant Justin Spaid testified that they
went to Banks’s home to arrest him. Officer Redding also
stated that he did not believe he needed a search warrant to
enter the porch because the police had reasonable suspicion
that Banks, as a convicted felon, was committing a crime by
possessing a gun. Nor did Officer Redding believe he had
enough time to contact a judge to obtain a search warrant.
 After the hearing, the magistrate judge issued a report rec-
ommending that the district court deny Banks’s motion. The
magistrate examined the case through the lens of Terry v.
Ohio, which held that an officer who has reasonable suspicion
to believe that dangerous criminal activity is afoot can briefly
detain and frisk a person. 392 U.S. 1, 21–22 (1968). Pointing to
the officers’ reasonable suspicion that Banks possessed a gun
and relying on our prior decision in United States v. Richmond,
924 F.3d 404 (7th Cir. 2019), the magistrate concluded that the
officers had ample suspicion to step onto Banks’s front porch.
On these facts, the magistrate saw no Fourth Amendment vi-
olation.
 The district court agreed, adopted the magistrate’s recom-
mendation, and denied Banks’s motion to suppress. Banks
then entered a conditional guilty plea and received a sentence
of time served and three years’ supervised release. He now
appeals the district court’s suppression ruling.
 II
 A
 By its terms, the Fourth Amendment protected Jeremy
Banks’s right “to be secure” in his “hous[e]” from “unreason-
able searches and seizures.” U.S. Const. amend. IV. At the
4 No. 22-1312

“very core” of that protection, the Supreme Court has empha-
sized, stands “the right of a man to retreat into his own home
and there be free from unreasonable governmental intru-
sion.” Silverman v. United States, 365 U.S. 505, 511 (1961). In-
deed, when measuring the strength of the Fourth Amend-
ment, “the home is first among equals.” Florida v. Jardines, 569
U.S. 1, 6 (2013). This principle finds deep roots in the common
law backdrop against which the Fourth Amendment entered
the U.S. Constitution in 1791. See, e.g., Semayne’s Case (1604)
77 Eng. Rep. 194, 195; 5 Co. Rep. 91 a, 91 b (KB) (“[T]he house
of every one is to him as his castle and fortress, as well for his
defen[s]e against injury and violence, as for his repose.”).
 By 1984 the Supreme Court made plain that the Fourth
Amendment provides equal protection to a home’s curtilage,
the area immediately surrounding the home itself. See Oliver
v. United States, 466 U.S. 170, 180 (1984). “[P]rivacy expecta-
tions are most heightened” in the curtilage, because that area
is “intimately linked to the home, both physically and psycho-
logically.” California v. Ciraolo, 476 U.S. 207, 213 (1986). And
the right to retreat into the home “would be of little practical
value if the State’s agents could stand in a home’s porch or
side garden and trawl for evidence with impunity.” Jardines,
569 U.S. at 6. Put even more directly, the curtilage is “part of
the home itself for Fourth Amendment purposes.” Id. (quot-
ing Oliver, 466 U.S. at 180).
 The parallel and equivalency between a home and its cur-
tilage means that law enforcement officers must have a war-
rant to enter either, unless one of a few limited exceptions ap-
plies. See Lange v. California, 141 S. Ct. 2011, 2017 (2021). The
exceptions allow warrantless entry when, for example, exi-
gent circumstances exist, the resident consents to entry, or the
No. 22-1312 5

officers conduct a knock-and-talk. See id. (explaining that ex-
igent circumstances include rendering emergency aid, pre-
venting the imminent destruction of evidence, or engaging in
hot pursuit of a fleeing felon); United States v. Correa, 908 F.3d
208, 221 (7th Cir. 2018) (consent); see Jardines, 569 U.S. at 8
(knock-and-talk). These exceptions reflect and reinforce that
the Fourth Amendment’s “ultimate touchstone” remains
“reasonableness.” Kentucky v. King, 563 U.S. 452, 459 (2011)
(citation omitted).
 B
 These principles find straightforward application on the
record before us.
 The police reacted to Banks’s Snapchat post by immedi-
ately heading to his home to arrest him for unlawful gun pos-
session. But they never paused to request a warrant. And that
omission matters because the Fourth Amendment very much
concerns itself with place, and the location of the planned ar-
rest—Banks’s front porch—is not one the police could enter
without consent or exigent circumstances. Everyone agrees
that neither existed before the police walked onto the porch,
as Banks presented no imminent threat or flight risk in the
circumstances. Nor did the police even attempt to conduct
their encounter with Banks as a consensual knock-and-talk
scenario. The officers needed a warrant to enter Banks’s
porch, and their failure to obtain one resulted in a clear Fourth
Amendment violation.
 The unlawful entry onto the curtilage tainted the evidence
they discovered. Through their “unlicensed physical intru-
sion” onto Banks’s porch, the officers created any exigent cir-
cumstances that might have developed during their ensuing
6 No. 22-1312

struggle with Banks. See Jardines, 569 U.S. at 7. The officers, in
short, were unable to rely on those exigent circumstances to
authorize the entry onto Banks’s porch.
 C
 The government urges a different analysis, pointing us to
our 2019 decision in United States v. Richmond. Milwaukee of-
ficers spotted Antoine Richmond on a sidewalk, acting suspi-
ciously and carrying what appeared to be a gun in his shirt
pocket. After following Richmond back to his duplex, the of-
ficers watched Richmond hide something on the front porch.
The officers stepped onto the porch, confirmed Richmond
was a convicted felon, and found that he had stashed a gun
behind a screen door. See 924 F.3d at 408–09. On appeal Rich-
mond conceded that he consented to the officers stepping
onto his porch. See id. at 413. Because the officers also had rea-
sonable suspicion that Richmond was engaged in criminal ac-
tivity, we held that they could perform a protective search un-
der Terry once they were “lawfully within the curtilage of a
home.” Id. at 412.
 The government highlights one line in Richmond where we
stated that reasonable suspicion “justified [the officers’] entry
onto the porch.” Id. at 413. From there the government reads
Richmond as authorizing warrantless entry onto the curtilage
based on reasonable suspicion, which the officers had in this
case after viewing Banks’s Snapchat video.
 We cannot agree. Consent is a well-accepted exception to
the warrant requirement, but reasonable suspicion is not. In
Richmond both parties agreed that the officers had consent to
enter the curtilage. See id. Our language about whether rea-
sonable suspicion independently justified the officers’ entry
No. 22-1312 7

was not essential to our holding given Antoine Richmond’s
consent to the police being on his porch. It does not control
today’s decision.
 Even more, the government’s reading would impermissi-
bly expand exceptions to the warrant requirement. The gov-
ernment does not argue that reasonable suspicion authorizes
warrantless entry into the home. For good reason—the Fourth
Amendment expressly references the home and provides that
“no Warrants shall issue, but upon probable cause, supported
by Oath or affirmation, and particularly describing the place
to be searched, and the persons or things to be seized.” U.S.
Const. amend. IV (emphasis added). And the home’s curti-
lage, the Supreme Court has emphasized, receives “protec-
tion as part of the home itself.” Jardines, 569 U.S. at 6. If rea-
sonable suspicion does not allow an officer to enter the home,
then it also does not constitute one of the “few permissible
invasions” of the curtilage. Caniglia v. Strom, 141 S. Ct. 1596,
1599 (2021).
 We also know that the Supreme Court is “not eager—more
the reverse—to print a new permission slip for entering the
home without a warrant.” Lange, 141 S. Ct. at 2019. Indeed,
the Court has refused to acknowledge new exceptions to the
warrant requirement both in the home and within the curti-
lage, even where the circumstances would have allowed a
warrantless search somewhere else. In Collins v. Virginia, 138
S. Ct. 1663 (2018), for instance, the Court held that the auto-
mobile exception—which ordinarily allows officers to con-
duct a warrantless search of a car based on probable cause—
does not apply to a vehicle parked in a partially enclosed
driveway. See id. at 1668. And in Lange, the Court concluded
that there was no categorical exception to the warrant
8 No. 22-1312

requirement allowing officers to chase a fleeing misdemean-
ant into an attached garage. See 141 S. Ct. at 2016, 2021–22.
These teachings apply here: reasonable suspicion was not
enough to allow warrantless entry onto Banks’s porch, even
though it might have justified a Terry stop somewhere else.
 The government further contends that even if the police’s
search violated the Fourth Amendment, the evidence should
not be suppressed under the good-faith exception to the ex-
clusionary rule. That exception provides that “[e]vidence ob-
tained during a search conducted in reasonable reliance on
binding precedent is not subject to the exclusionary rule.” Da-
vis v. United States, 564 U.S. 229, 241 (2011). As the government
sees it, the officers here relied in good faith on Richmond.
 But recall that Richmond rooted itself in consent, a well-es-
tablished exception to the warrant requirement. See Correa,
908 F.3d at 221. The decision does not authorize what the of-
ficers did here—intrude onto a front porch without a warrant
and based solely on reasonable suspicion. Because the officers
did not obtain evidence in “reasonable reliance on binding
precedent,” id., the good-faith exception to the exclusionary
rule does not apply.
 D
 The big picture takeaway from today’s decision deserves
underscoring. The police could have avoided this outcome by
taking a small but necessary step. The suppression testimony
confirmed that Sangamon County, where Springfield is lo-
cated, has a judge on call 24 hours a day, 365 days a year to
consider and issue search warrants. The officers here had
more than enough to pick up the telephone, call the on-duty
No. 22-1312 9

judge, and get the authorization the Fourth Amendment re-
quired before stepping onto Banks’s porch.
 For these reasons, we REVERSE the judgment below and
REMAND for further proceedings consistent with this opin-
ion.