Filed 1/28/22 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C090482 |
| Plaintiff and Respondent, | (Super. Ct. Nos. STK-CR-FECOD-2015-0006547 & SF131576A) |
| v. | |
| DONALD RORABAUGH, | ORDER MODIFYING OPINION |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 25, 2022, be modified as follows:

On page 23, following the heading "*Analysis*" the sentence beginning with "Here, there was substantial evidence" is deleted and the following sentence is inserted in its place:

> Here, there was substantial evidence at the close of the prosecution's case-in-chief that defendant murdered Magana.

1

There is no change in the judgment.


FOR THE COURT:


  /s/
RAYE, P. J.


  /s/
BLEASE, J.


  /s/
HOCH, J.

Filed 1/25/22 (unmodified opn.)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| THE PEOPLE, | C090482 |
| Plaintiff and Respondent, | (Super. Ct. Nos. STK-CR-FECOD-2015-0006547 & SF131576A) |
| v. | |
| DONALD RORABAUGH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Charlotte J. Orcutt, Judge. Reversed with directions.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Chung Mi Choi, and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

1

When executing a search warrant at defendant Donald Rorabaugh's home, police learned that one of his cars was a short distance away, at a ranch. Police went to the ranch and towed the car away to be stored until they could obtain a warrant to search it. Later, the trial court denied defendant's motion to suppress evidence found in the car. In closing argument to the jury, the prosecution argued DNA evidence found in the car corroborated its theory of defendant's culpability for murder.

After the jury found defendant guilty of first degree murder, the trial court imposed a term of 25 years to life in prison.

On appeal, defendant contends the trial court erroneously denied (1) his suppression motion and (2) his motion for acquittal. We agree with defendant's first claim and disagree with his second claim.

We conclude police violated the Fourth Amendment when they conducted a warrantless seizure of defendant's unattended car on private property. We further conclude the trial court's failure to suppress evidence obtained after a search of the car was prejudicial error. Accordingly, we reverse defendant's conviction and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Around 2:30 a.m. on May 24, 2015, several dogs belonging to a husband and wife that lived on a property in rural San Joaquin County began barking and woke up the couple. The wife heard a vehicle and let the dogs outside. The dogs kept barking after she heard the car turn off. About 15 minutes later, she heard the car start up again and "peel[] out." The dogs stopped barking, and she let them back into the house.

Later that morning, the wife saw a body in an irrigation canal that bordered her property.

Police found drag marks from a road to the location in the canal where the body was found and red marks consistent with blood nearby.

2

An autopsy noted the victim, Edward Magana, had broken ribs, bruising on his left lung and eyelids, and abrasions on his face, abdomen, and arms. Bleeding in the whites of his eyes and injuries to his neck indicated Magana was strangled, and large bruises on the scalp and temple and bleeding on the surface of the brain indicated he received forceful blows to the head.

The pathologist who conducted the autopsy testified that either strangulation or blunt force trauma to the head could have killed Magana, but "[c]ertainly together these two caused his death."

An acquaintance of defendant's testified that he ran into defendant at a bar (called "108 Sports Lounge" or "108 bar") the night before Magana's body was found, around 11:00 p.m. At the bar, located in Riverbank, California, the acquaintance introduced defendant to the man who would later become a codefendant in this case, Joseph Denner.

The manager of the bar testified that Magana frequented the bar, and that both defendant and Denner were at the bar the night Magana was killed.

Magana's wife testified she knew defendant but not Denner, and that defendant and Magana occasionally drank together at the 108 bar.

A bartender who worked the night of Magana's death testified she knew defendant from before but met Denner for the first time that night. She recalled that defendant left the bar around 1:45 a.m., but Denner stayed and helped clean up. Denner left in a car with three males who had been at the bar earlier wearing tuxedos.

A witness testified that he went to 108 bar that night dressed in a tuxedo and gave Denner a ride a few blocks from the bar.

Two women who were at the bar together that night testified that, around 2:00 a.m., they gave defendant a five-minute ride from the bar to defendant's home in Riverbank. They testified that, when defendant got out of the car, he greeted a male, who one of the women recalled was wearing a backpack that she "would guess" was black.

3

A Riverbank resident with whom Magana lived for two years (around 2012-2014) testified that after Magana moved out of her home, she periodically continued to see Magana in town, sometimes out "walking or . . . at the bar." Magana had no fixed address, and was living "place to place." She testified that the last time she saw Magana was several days before May 24, 2015. Magana was "just walking down the street," with a black backpack. "Every time I'd see him walking he would have [that backpack] with him," the witness said.

Defendant's father testified that defendant lived with him at a house in Riverbank. Defendant had a 1966 Oldsmobile Cutlass, which was "very loud" due to its engine and muffler. Around 2:30 a.m. on May 24, 2015, defendant's father heard defendant being dropped off in a car and then saw defendant enter the garage of the house, where he normally slept. Then, around 4:30 a.m., he heard loud noises that he associated with his son's car.

Defendant's father insisted at trial that during a recorded jail conversation with defendant, he was referring to the following morning, not the morning Magana's body was found, when he told defendant he had heard a car trunk slamming or someone kicking the car two or three times at 4:30 a.m.

Video surveillance from a Riverbank business showed a light-colored Cutlass being driven in town at 2:54 a.m. on May 24, 2015.

At 2:28 p.m. on May 28, 2015, Stanislaus County Sheriff's officers obtained search warrants for defendant's home, Denner's home, and "[u]nknown vehicles" at the addresses. Officers immediately executed the search warrant at defendant's home, and learned that defendant's Cutlass was less than a three-minute drive away, on a ranch on the other side of a local river. They went directly from defendant's home to the ranch, found defendant's Cutlass, and towed it to the Stanislaus County Sheriff's Office in Modesto to be stored until a search warrant could be obtained for the vehicle.

4

Blood in the trunk of the car matched Magana's DNA profile. A DNA swab from the steering wheel matched defendant's DNA profile, and Denner was a possible major contributor to DNA on a passenger door handle.

*Codefendant Denner's Testimony*

Denner did not recall being introduced to defendant at the bar that night or ever meeting him. The first time he remembered seeing defendant, he was on top of another man punching him in the face, when Denner was walking in Riverbank after the 108 bar closed. Denner tried to intervene to help the man defendant was assaulting, but defendant shoved him to the ground, told Denner he had a gun, and told Denner he "had to help" defendant.

Defendant forced Denner to: assault Magana; help defendant put Magana into the trunk of a car; and sit in the front passenger seat of defendant's car.

Defendant drove the car to a canal and made Denner help him lift Magana out of the trunk. Magana was moaning and blood was coming from his nose. Denner saw blood in the trunk. Defendant put Magana in the canal, making a splash of water.

*Defendant's Testimony*

Defendant testified he is six feet two inches tall and weighs 380 pounds. On the evening of May 23, 2015, he had been drinking at a friend's house. He drove his Cutlass home around 6:00 p.m. He returned to his friend's house in his friend's car, and stayed until around 10:00 p.m., when he walked to a first bar, and then walked to the 108 bar, arriving around 11:00 p.m.

He left the 108 bar at closing time, around 2:00 a.m., and got a ride home from friends. He did not recall being introduced to Denner that night, explaining that he was sometimes "introduced to 20 or 30 people a night" at the 108 bar. He had no knowledge of ever meeting Denner.

5

And he did not recall greeting anyone when he was dropped off, explaining that he had "been drinking an excessive amount that day. . . . I possibly could have seen somebody and shook their hand, I'm not one hundred percent sure."

Defendant testified that after his friends dropped him off, he went to bed, and woke up the next morning around 8:00 a.m.

The following day, Memorial Day, he took his Cutlass to the ranch of a friend of the family where he had been keeping it "for years." Though the Cutlass did not have "tags on it" at the time, defendant "had maybe been driving it for about two weeks, three weeks, because [he] blew the motor up in" his other car. So he "took the chance of driving it."

Defendant took the Cutlass to the friend's ranch, so that he could work on another car in his driveway in Riverbank. "[A]t the house, it's blacktop and concrete. At the ranch it's all loose gravel and big chunky rocks, so laying on the ground [didn't] feel too good."

Defendant knew Magana. They drank beer and played pool in bars. Defendant saw Magana "maybe once every couple months at the bar," or "walking around."

Defendant had the only set of keys to the Cutlass. Defendant agreed that his Cutlass's engine was loud, and testified that he did not hear his car leave his home between 2:30 a.m. and 3:00 a.m. He "imagine[d] [he] would have heard it," if the Cutlass started and left without him, but he "was pretty drunk . . . though."

The last time defendant saw Magana was two weeks before the night he died. Defendant had no idea how Magana's blood got in the trunk of his car or how Denner's DNA got inside the car.

He believed the video showing a car that looked like his Cutlass was from the previous day, not May 24.

6

*Verdicts and Judgment*

In December 2017, a jury found defendant guilty of first degree murder, and found "not true" the allegation that defendant committed the murder while engaged in the commission of kidnapping. Denner was found not guilty of first degree murder and guilty of second degree murder.

In June 2019, defendant filed a motion for a new trial, arguing, inter alia, there was insufficient evidence for the jury's verdict and the trial court erred in denying his motion for acquittal.

In September 2019, the trial court denied the new trial motion and sentenced defendant to a term of 25 years to life in prison.

Defendant timely appealed.

DISCUSSION

I

*Motion to Suppress Evidence*

A. *Parties' Arguments and Trial Court Ruling*

In July 2016, defendant filed a motion to suppress evidence pursuant to Penal Code section 1538.5, arguing that the "warrantless seizure of the car from private property where it was rightly stored" violated the Fourth Amendment, as explained in *Coolidge v. New Hampshire* (1971) 403 U.S. 443 (*Coolidge*). Defendant argued that officers "could easily have adapted the warrants" they had already obtained "for the seizure of the car. But instead they chose to go behind the warrant requirement of the Fourth Amendment and conduct their own extra-judicial procedure without the signature of a neutral and detached magistrate."

Acknowledging defendant's "legitimate property right to the vehicle seized," the People opposed the motion, arguing the seizure was "well within the automobile exception."

7

David Christensen, owner and resident of the rural property where defendant's car was found, was the sole testifying witness at the October 2016 suppression hearing. He explained that pursuant to a long-standing arrangement with defendant's family, defendant repaired and maintained Christensen's farm equipment and personal vehicles, and in exchange, Christensen allowed defendant to keep his car just inside the "edge of the property line," a place visible from Christensen's "front door or front window or a bedroom window." Christensen sometimes saw defendant on the property, working on the car. No one outside defendant's family had permission to store their vehicles on the property.

The property was not accessible by public road, but by a "[p]rivate driveway," which was three-quarters of a mile long. The driveway had a gate, but the gate was not locked at the time of the seizure.

On the day of the seizure, Christensen was home when an officer approached him around 3:00 p.m. and told him law enforcement was "[l]ooking at [the] car" and would tow it. No one asked for permission to tow the car.

Defendant's car was about 200 yards from Christensen's home, and had been there for about six months before it was seized. Christensen did not have keys to the car, had no ownership interest in it, and never agreed with defendant that he would "keep an eye on" it. He did not tell law enforcement not to take the car and did not try to stop them from taking it.

In argument at the hearing, defense counsel argued that under *Coolidge*, the evidence obtained via seizure of the car had to be suppressed.

The prosecutor argued *Coolidge* was "a 1971 case, [that] ha[d] been eviscerated for th[e] particular proposition" that defendant relied on: "the idea of getting a warrant for [a] vehicle because the person had been arrested." This was so, the prosecutor argued, because subsequent case law "says the automobile exception . . . is basically, in and of itself, the exigent circumstances . . . because of the inherent mobility of the

8

vehicle, whether the defendant . . . is right there in proximity to the vehicle." "[O]n top of that," the prosecutor argued, defendant's car "was on somebody else's private property," which meant that defendant had "no expectation of privacy" vis-à-vis the seizure of his car.

The trial court denied the suppression motion, explaining that "since *Coolidge*" the United States Supreme Court "created the automobile exception. That exception says that officers can search a car independent of the detention or arrest of the defendant when there is probable cause to believe the vehicle contains evidence of a crime. So what is the probable cause in this case?" After the trial court and the parties discussed the sequence of events of the murder investigation leading up to the warrantless seizure of defendant's vehicle in San Joaquin County by Stanislaus County law enforcement, the trial court explained that "probable cause for evidence of a crime also applies to parked cars . . . ."

The trial court continued: "So what we have is we have a vehicle that has been parked at a house that does not belong to the defendant, so there is a reduced expectation of privacy, and the vehicle was seized the same day that [law enforcement] got the information about [d]efendant" from Denner, and then obtained "the search warrant for [d]efendant Rorabaugh's house," during the search of which, defendant's father "tells them about the car" a short distance away. "In this vehicle police can expect to find possibly bodily fluids, maybe items belonging the victim, since it is alleged that the victim was transported in the trunk of the vehicle. [¶] There is very little expectation of privacy in a vehicle left in somebody else's house when that person does not have the keys and he can only see the vehicle from certain vantage points within the house."

The trial court denied the suppression motion, ruling the case fell "squarely within" the automobile exception, despite "[t]he case relied on by the defense," which was "old law."

9

B. *Parties' Arguments on Appeal*

In initial briefing, defendant argued the trial court erred by denying his suppression motion because "it was unlawful for law enforcement to enter the curtilage of [the] farm and seize" defendant's car, as the automobile exception "is limited to the vehicle itself and does not . . . allow law enforcement to invade the space outside of the automobile without a warrant when that space is part of the curtilage of the home." For that proposition, defendant relied on *Collins v. Virginia* (2018) 584 U.S. ___ [201 L.Ed.2d 9] (*Collins*), which was decided after the jury found him guilty and before he filed a new trial motion.

The People argued the trial court properly denied the suppression motion, because "police officers [had] sufficient probable cause to seize" defendant's car "under the automobile exception to conduct a search for evidence of" the murder. Defendant's car was not in the "curtilage" of landowner's home, the People argued. Rather, it was found "200 yards away."

Further, the People argued the car "itself was evidence of the commission of the" murder, rendering warrantless seizure of the car "lawful[] . . . under the instrumentality of the crime exception." And, defendant "had no reasonable expectation of privacy in the [landowner's] home and property," as he "did not reside" there, "was not an overnight guest," and "society is [un]willing to recognize as reasonable" a "subjective expectation of privacy in an open fields area."

After initial briefing was complete, we asked the parties to address in supplemental briefing whether the warrantless seizure of defendant's car on private property was lawful under *Coolidge*, and whether the automobile exception applied to the seizure.

In supplemental briefing, defendant argues "*Coolidge* and *Collins* make clear that based on longstanding Fourth Amendment precedent, the automobile exception does not apply in the present case because the vehicle seized was parked on private residential

10

property in which appellant had a legitimate expectation of privacy. Accordingly, it was unlawful for law enforcement to enter the curtilage of the farm to seize appellant's vehicle without a warrant."

The People argue in supplemental briefing that the automobile exception applies to the warrantless seizure of defendant's vehicle, "because the car was readily mobile and officers had probable cause to believe the vehicle contained evidence of a crime."

C. *Legal Principles*

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.)

In *Chambers v. Maroney* (1970) 399 U.S. 42, the Supreme Court "held that where police have probable cause to stop and search a car without a warrant, a subsequent search of the car after it has been driven to a police station is also permissible without a warrant. [Citation.] *Chambers* observed that the high court had long adhered to the rule that a warrantless search of an automobile is permissible so long as the police have probable cause to believe the car contains evidence or contraband. [Citations.] This exception to the warrant requirement, *Chambers* said, is *justified by the ease with which an automobile might be moved out of the jurisdiction before a warrant can be obtained*. [Citation.] Although *Chambers* recognized that the problem of mobility might be solved by first seizing the car and then seeking a search warrant, the high court declined to adopt such a rule: 'For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.' " (*Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1225-1226, italics added.)

11

The next year, in *Coolidge*, the court ruled the "automobile exception" to the Fourth Amendment's warrant requirement did not apply to seizure and subsequent search at a police station of a car that was parked in plain view in the defendant's driveway, when defendant already had been arrested inside his home. (*Coolidge*, *supra*, 403 U.S. at pp. 456, 458-464.) This was so despite probable cause to search the car. (*Id.* at p. 458 ["even granting that the police had probable cause to search the car, the application of the [automobile exception] to these facts would extend it far beyond its original rationale"]; *id.* at p. 464 ["Here there was probable cause, but no exigent circumstances justified the police in proceeding without a warrant."].)

The court explained that the "underlying rationale" of the automobile exception to the Fourth Amendment's warrant requirement -- that it is " 'not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought' " -- was inapplicable in the case, because "[t]he opportunity for search" was not " 'fleeting,' " and "[t]he objects that the police are assumed to have had probable cause to search for in the car were neither stolen nor contraband nor dangerous." (*Coolidge*, *supra*, 403 U.S. at pp. 459-460.)

The court explained: "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears. And surely there is nothing in this case to invoke the meaning and purpose of the [automobile exception articulated in earlier precedent] -- no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile. In short, by no possible stretch of the legal imagination can this be made into a case where 'it is not practicable to secure a warrant,' [citation], and the 'automobile exception,' despite its label, is simply irrelevant." (*Coolidge*, *supra*, 403 U.S. at pp. 461-462, fn. omitted.)

*Coolidge* also rejected the government's argument for "warrantless seizure and search of the [defendant's] car . . . [as] an 'instrumentality of the crime,' . . . [that] might be seized by the police on [defendant's] property because it was in plain view." (*Coolidge*, *supra*, 403 U.S. at p. 464.)  The court explained the " 'plain view' " exception was inapplicable because the doctrine applies only when a police officer has "a *prior justification for an intrusion* in the course of which he came inadvertently across a piece of evidence incriminating the accused," "whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other *legitimate reason for being present unconnected with a search* directed against the accused."  (*Id.* at p. 466, italics added.)

"The criteria that generally guide 'plain view' seizures were set forth in *Coolidge* . . . ."  (*Horton v. California* (1990) 496 U.S. 128, 134 (*Horton*).)  The opinion "described the two limitations on the [plain view] doctrine . . . implicit in its rationale: First, 'that plain view alone is never enough to justify the warrantless seizure of evidence,' [citation]; and second, 'that the discovery of evidence in plain view must be inadvertent.' [Citation.]" (*Id.* at p. 136.)  "It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed.  There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure.  First, not only must the item be in plain view, its incriminating character must also be 'immediately apparent.' [Citations.]  Thus, in *Coolidge*, the cars were obviously in plain view, but their probative value remained uncertain until after the interiors were swept and examined microscopically.  Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she *must also have a lawful right of access to the object itself*." (*Id.* at pp. 136-137, fn. omitted, italics added.)

*Horton* emphasized that "[t]he right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and

seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property." (*Horton*, *supra*, 496 U.S. at p. 133.)

The different interests that the Fourth Amendment protects were discussed in *Soldal v. Cook County* (1992) 506 U.S. 56 (*Soldal*), wherein the court explained that even though "no invasion of personal privacy has occurred" if police "lawfully enter a house," and "come across some item in plain view and seize it," further "scrupulous[] . . . inquiry" is necessary to vindicate the Fourth Amendment. (*Soldal,* at pp. 65-66.) "[I]n the absence of consent or a warrant permitting the seizure of the items in question, such seizures can be justified only if they meet the probable-cause standard, [citation], *and if they are unaccompanied by unlawful trespass*, *Horton*, 496 U.S. at [pp.] 136-137. That is because, the absence of a privacy interest notwithstanding, '[a] seizure of the article . . . would obviously invade the owner's possessory interest.' " (*Id.* at p. 66, fns. omitted.)

Recently, in *Collins*, the Supreme Court ruled that "the automobile exception does not permit an officer without a warrant to enter a home or its curtilage in order to search a vehicle therein." (*Collins, supra*, 584 U.S. at p. ___ [201 L.Ed.2d at p. 24].) In reaching that result, the court reaffirmed the "plain-view seizure" principles articulated in *Horton* and *Soldal*. (*Collins,* at p. ___ [201 L.Ed.2d at p. 20].)

Thus, *Coolidge*, as amplified by *Horton* and *Soldal*, continues to stand for the proposition that if (a) police do not have an otherwise lawful right of access to an unattended car on private property, and (b) it is not impracticable to obtain a warrant, then (c) warrantless seizure of the car accomplished by trespassing on private property (and subsequently searching the car at another location) is a violation of the Fourth Amendment, and does not fall within the automobile exception, even if there is probable cause to search it.

14

D.  *Analysis*

i.  *Coolidge* Claim

Applying *Coolidge* and its progeny, we conclude the trial court should have granted defendant's suppression motion.

Here, the record reflects that around 2:30 p.m., on May 28, 2015, officers obtained and executed a search warrant for defendant's home in Riverbank, California, and any unknown vehicles at the home.  During execution of the warrant, officers learned that defendant's Cutlass was a short drive away, on a ranch.  Officers went directly to the ranch, via a gated private driveway that was three-quarters of a mile long.  Around 3:00 p.m., officers encountered Christensen at his home on the ranch.  They also found defendant's car, which was about 200 yards away and visible from the home, just inside the edge of Christensen's property line.  Officers did not ask Christensen for permission to be on his land or to tow the car.  Officers towed the car to a police station in Modesto to be stored until a search warrant could be obtained for the car.

The record is devoid of any indication police had a lawful right of access to defendant's car that was on Christensen's private property with the latter's knowledge and consent.  The record is also devoid of any suggestion that it was impracticable to secure a warrant once police located and identified defendant's unattended vehicle on Christensen's land at 3:00 p.m., around one hour after they obtained a warrant for "[u]nknown vehicles" at defendant's home.

Accordingly, the warrantless seizure of defendant's car was in violation of the Fourth Amendment, regardless of the "automobile exception" applicable in other contexts, and evidence obtained through a subsequent search of the car should have been suppressed.

The People attempt to distinguish *Coolidge*, arguing "the record shows that it was not practicable for the police to secure a warrant before seizing the vehicle."  The record

15

shows no such thing.[1]  We can discern no way in which it would have been impracticable to return to the judge who authorized the search warrant in order to obtain authorization to seize the car sitting on Christensen's land.

The People's contention that the car was "readily mobile" also lacks support in the record.  The People concede for purposes of the Fourth Amendment issue that defendant had *already* been arrested at his home, and was in custody before police towed the car, and Christensen did not have a key to the car.

Cases the People rely on in supplemental briefing are distinguishable.  *Florida v. White* (1999) 526 U.S. 559 was a case about warrantless seizure of a car, where "the vehicle *itself* was contraband under" state law.  (*Id.* at p. 565.)  No such principle applies here.  Further, the high court emphasized that the warrantless seizure at issue occurred in a "public area," whereas here, the car was on private property.  (*Id.* at pp. 565-566.)

In *Pennsylvania v. Labron* (1996) 518 U.S. 938 (*Labron*), the high court reversed two decisions by the Supreme Court of Pennsylvania that -- due to the absence of exigent circumstances -- suppressed evidence found during warrantless searches of automobiles. (*Id.* at pp. 939-940.)

In the first case, "police observed respondent Labron and others engaging in a series of drug transactions on a street in Philadelphia," "arrested the suspects, searched the trunk of a car from which the drugs had been produced, and found bags containing

---

[1]  The record on appeal does not support the People's list of possible destructions of evidence that police "had to act swiftly" to prevent -- including that the vehicle "could have been quickly driven" away or "easily destroyed" by a fire.  (See *People v. Hall* (2020) 57 Cal.App.5th 946, 957, fn. 7 ["Our Supreme Court has 'cautioned that appellate courts should not consider a Fourth Amendment theory for the first time on appeal when "the People's new theory was not supported by the record made at the first hearing and would have necessitated the taking of considerably more evidence . . ." or when "the defendant had no notice of the new theory and thus no opportunity to present evidence in opposition." ' [Citation.]"].)

cocaine." In the second case, "an undercover informant agreed to buy drugs from respondent Randy Lee Kilgore's accomplice, Kelly Jo Kilgore. To obtain the drugs, Kelly Jo drove from the parking lot where the deal was made to a farmhouse where she met with Randy Kilgore and obtained the drugs. After the drugs were delivered and the Kilgores were arrested, police searched the farmhouse with the consent of its owner and also searched Randy Kilgore's pickup truck; they had seen the Kilgores walking to and from the truck, which was parked in the driveway of the farmhouse. The search turned up cocaine on the truck's floor." (*Labron*, *supra*, 518 U.S. at p. 939.)

The Supreme Court observed that its "first cases establishing the automobile exception to the Fourth Amendment's warrant requirement were based on the automobile's 'ready mobility,' an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear," and explained that "[m]ore recent cases provide a further justification: the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation." Thus, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." (*Labron*, *supra*, 518 U.S. at p. 940.)

*Labron* does not implicate the proposition in *Coolidge* that is relevant here, because neither of the two cases discussed in *Labron* concerned (a) seizure of an unattended automobile accomplished by (b) unlawful trespass on private property. First, *Labron* concerned car searches, not car seizures. Second, the first case in *Labron* concerned a car search on a public street, while the second case involved a search of a vehicle parked in the driveway of the farmhouse, after the owner of the farmhouse consented to search of the farmhouse.

*United States v. Brookins* (4th Cir. 2003) 345 F.3d 231, which the People cite in support of a proposition that "[p]olice may seize vehicles that are located on private property, pursuant to the automobile exception" relies on *Labron*, and its emphasis of the

17

importance of "ready mobility" vis-à-vis the automobile exception. (*Brookins,* at pp. 235, 237-238.) And, as we explained above (i) there is no support in the record for the notion that defendant's car was "readily mobile" when police seized it, and (ii) the facts here are quite different from those present in *Labron.*

As our discussion above makes plain, and contrary to the prosecutor's argument and the trial court's reasoning at the suppression hearing in this case, the Supreme Court did not create the automobile exception after it decided *Coolidge.* The court has elaborated and clarified the contours of the exception since *Coolidge*, but not in a way that undermines the continuing viability of the reasoning of *Coolidge* that is applicable here.

### ii. Other Theories Advanced for Warrantless Seizure

The People argue defendant's car was properly "seized and examined without a warrant under the instrumentality exception to the warrant requirement."

But as *Coolidge* explains, when an item is seized on private property, the "instrumentality of the crime" exception to the Fourth Amendment's warrant requirement applies only if police have "a prior justification for [the] intrusion" and see the item in plain view. (*Coolidge, supra*, 403 U.S. at p. 466; cf. *Trent v. Wade* (5th Cir. 2015) 776 F.3d 368, 386 [because an officer "was lawfully on the [private] property when he observed the [all-terrain vehicle], which had just been used as an instrumentality in the crime of evading arrest," the officer "did not violate clearly established law by effecting a seizure of the automobile"]; *People v. Balint* (2006) 138 Cal.App.4th 200, 205, fn. 2 [noting the "prosecution did not argue that investigators could seize" an incriminating item under the plain view doctrine, as an instrumentality of a crime].)

Here, police had no prior justification for their trespass on Christensen's private property. Accordingly, the "instrumentality of the crime" exception is inapplicable.

The People also argue defendant's Fourth Amendment rights were not violated because defendant "did not have a reasonable expectation of privacy" in Christensen's

18

property, as he "did not reside on the property and was not an overnight guest." Further, the people maintain that a "subjective expectation of privacy in an open fields area is not an expectation that society is willing to recognize as reasonable."

These arguments are unpersuasive, because they fail to grapple with the notion -- suggested in *Coolidge* and fully articulated in *Horton* and *Soldal* -- that the Fourth Amendment *protects more than just privacy*: "[T]he absence of a privacy interest notwithstanding, '[a] seizure of [an] article . . . would obviously invade the owner's possessory interest,' " (*Soldal, supra*, 506 U.S. at p. 66) thereby "depriv[ing] the individual of dominion over his or her . . . property." (*Horton*, *supra*, 496 U.S. at p. 133.)

### iii. *Collins* Claim

Initially, we observe that because defendant -- in conjunction with his June 2019 filing for a new trial -- did not pursue a new suppression ruling in light of *Collins* (decided in May 2018), he has forfeited the claim on appeal. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881 ["Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal," and " '[t]he purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected.' "]; *People v. Superior Court* (*Edmunds*) (1971) 4 Cal.3d 605, 611 [Pen. Code, § 1538.5, subd. (h) permits defendant to bring a new suppression motion "if there occur[s] an intervening change in the applicable law . . . in support of suppression"].)[2]

---

[2] The parties had an opportunity to brief forfeiture, a rule that is always implicated when a party raises an argument for the first time on appeal. (See *People v. Alice* (2007) 41 Cal.4th 668, 679 ["The parties need only have been given an opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis, or authority that is raised or fairly included within the issues raised does not implicate the protections of section 68081."].)

19

Further, the *Collins* claim lacks merit because we agree with the People the record provides no support for a conclusion that defendant's car -- 200 yards away from Christensen's home -- was within the "curtilage" of a home. (See *People v. Lieng* (2010) 190 Cal.App.4th 1213, 1223-1224 [while "the extent of curtilage on rural properties . . . will be greater than that in a densely populated urban setting," "even in rural areas, it is rare for curtilage to extend more than 100 feet beyond the home"].)

For support of the proposition that a home's curtilage can extend to a distance approximating the 200 yards, defendant provides nothing other than a dissenting opinion in a federal appellate case.

### iv. Prejudicial Error

We agree with the parties that we must decide whether admission of the evidence obtained via the unlawful seizure and subsequent search of defendant's car was harmless beyond a reasonable doubt, under *Chapman v. California* (1967) 386 U.S. 18, 24. (See *People v. Moore* (2011) 51 Cal.4th 1104, 1128-1129.) The burden to demonstrate harmless error is the People's. (*People v. Ford* (2020) 56 Cal.App.5th 385, 392.)

The People argue any error was harmless because "the jury would have convicted" defendant "[e]ven in the absence of the evidence obtained from the car."

We disagree, because the prosecutor specifically relied on the DNA evidence found inside defendant's car in closing statements to the jury, arguing the evidence corroborated Denner's testimony.

The prosecutor told the jury: "You may not believe everything Mr. Denner said, but you have to look at what he said and see what is corroborated, what may not be corroborated. [¶] So in this case Mr. Denner says the defendant . . . struck [Magana] on the face. He kicked and stomped . . . Magana. . . . He also says they drove to Henry and River Road. He said he was in the passenger seat. His DNA is on the interior of the passenger door handle. He says he helps [defendant] retrieve a body from the trunk. He took the body from the trunk and helped retrieve it. . . . And he sees some blood in the

20

trunk. Well, there was blood in the trunk that belonged to . . . Magana. Okay, that corroborates the DNA that's found in the car . . . ."

Given the prosecutor's closing statement and the conflicting testimonies of defendant and Denner, the People have not carried their burden to demonstrate that erroneous admission of evidence obtained from the car was harmless beyond a reasonable doubt.[3]

II

*Motion for Judgment of Acquittal*

Defendant argues the trial court violated his Fourteenth Amendment right to due process when it erroneously denied his motion for acquittal under Penal Code section 1118.1.[4] The People argue the trial court properly denied the motion. We agree with the People.

*Additional Background*

When the People rested, defendant moved for a judgment of acquittal pursuant to Penal Code section 1118.1,[5] arguing there was "no evidence tying [defendant] to the killing of . . . Magana in any manner." The trial court denied the motion, explaining:

---

[3] We note the trial court, when denying defendant's motion for judgment of acquittal, specifically referenced the "significan[ce]" of evidence (1) the victim's blood was in the trunk of defendant's car, and (2) Denner's DNA "was found on the passenger interior door handle as opposed to the driver door handle."

[4] Because defendant limits his argument to the substantive murder charge, and does not contend there was insufficient evidence for the kidnapping allegation associated with the murder charge (which the jury found "not true"), we likewise limit our discussion to the murder charge.

[5] The provision provides, in relevant part, "In a case tried before a jury, the court on motion of the defendant . . . at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal . . . if the evidence then before the court is insufficient to sustain a conviction . . . ." (Pen. Code, § 1118.1.)

"Mr. Rorabaugh was at the 108 Club in the evening hours, and he stayed there until closing. He left around 2:00 a.m. He was dropped off outside his home . . . in Riverbank a little after 2:00 a.m. Mr. Rorabaugh gets out of the vehicle and greets someone who is walking on the sidewalk. And it's been testified to that this person had on a backpack. We know that the victim and the defendant do know each other. We know that the victim was transient at the time of his death, and he was a transient in Riverbank who often walked places, and he was known to carry a backpack. The victim was seen alive at least two days before the body was found, and his body was found in a canal. And the pathologist testified that his body had not been in a canal very long due to the condition of the body.

"The defendant's vehicle, which is a very distinctive vehicle, a 1966 Oldsmobile Cutlass, primer, with the front – I believe it's the driver's side quarter panel is a green color which stands out from the primer color. Defendant's car is seen heading in the direction of the canal in the early morning hours around 2:30 on the night of the murder. There was testimony that the defendant is the only one who had the keys to the vehicle, and the defendant's father testified that he heard the defendant come back in that vehicle the night of the murder.

"The victim's blood was found in the trunk of the defendant's vehicle. It's significant to me that it was blood that was found other than some other bodily fluid, and it's significant to me that the blood was found in the trunk which, you know, which would be an unusual place to find someone's blood, which leads the Court to believe that the victim was injured prior to going into the trunk.

"It's also significant that the codefendant, Joseph Denner's DNA was found on the passenger interior door handle as opposed to the driver door handle, which leads one to believe that Denner wasn't driving the vehicle. There was no evidence that the defendant's car was reported stolen. And it's also significant that the victim's blood was found on the pavement by the canal near the drag marks that led to the body.

22

"The Court finds that there is sufficient evidence to sustain a conviction beyond a reasonable doubt connecting the defendant to the murder."

*General Principles*

"In considering whether the trial court erred in failing to grant the motion for judgment of acquittal under [Penal Code] section 1118.1 . . . we ask whether 'there is any substantial evidence, including all reasonable inferences to be drawn from the evidence, of the existence of each element of the offense charged.' [Citation.] When, as here, the motion under [Penal Code] section 1118.1 was made 'at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point' in the trial [citation] -- in other words, based on the prosecution's case alone . . . . [¶] In assessing such a claim, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] 'The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails . . . whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020, fns. omitted.)

*Analysis*

Here, there was substantial evidence defendant murdered Magana at the close of the prosecution's case-in-chief.

There was evidence that when defendant was dropped off outside his home around 2:00 a.m., he greeted a man carrying a backpack. Defendant knew Magana, and Magana was known to carry a backpack. Around 2:30 a.m., several dogs belonging to a married couple that lived by the canal where Magana's body was found hours later began barking and woke up the couple. The wife heard a vehicle drive away about 15 minutes later.

23

Video evidence from around 2:50 a.m. on the night of the murder showed a car resembling defendant's moving around Riverbank. Around 4:30 a.m., defendant's father (who was at the home he shared with defendant) heard loud noises that he associated with his son's car. Magana's blood was found in the trunk of the defendant's car. This evidence reasonably supports the conclusion defendant murdered the victim.

## DISPOSITION

The judgment is reversed. On remand, the trial court is directed to enter an order granting defendant's motion to suppress.

/s/
HOCH, J.

We concur:

/s/
RAYE, P. J.

/s/
BLEASE, J.

24