

# NUMBER 13-21-00019-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

THE STATE OF TEXAS,                                                      Appellant,

v.

GLOVER JONES A/K/A
GLOVER B. JONES JR.,                                                     Appellee.

## On appeal from the County Court at Law No. 8
## of Travis County, Texas.

## MEMORANDUM OPINION

### Before Justices Longoria, Hinojosa, and Silva
### Memorandum Opinion by Justice Silva

Appellee Glover Jones a/k/a Glover B. Jones Jr. was arrested for driving while

intoxicated (DWI), a Class A misdemeanor.[1] *See* TEX. PENAL CODE ANN. § 49.04(a), (d)

---

[1] This case is before this Court on transfer from the Third Court of Appeals in Austin pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

(reclassifying Class B misdemeanor DWI to a Class A misdemeanor whenever a person driving while intoxicated is shown to have had an "alcohol concentration level of 0.15 or more at the time the analysis was performed"). A complaint and information followed, and Jones filed a motion to suppress evidence obtained from a warrantless search and seizure, which the trial court granted. By two issues, appellant the State of Texas challenges the trial court's ruling. We affirm.

## I.    BACKGROUND

On May 26, 2018, officers conducted a warrantless arrest of Jones at his residence inside The Coves, a gated community. In a written motion to suppress evidence, Jones asserted that the officers had unlawfully entered into his gated community, executed a warrantless search of his residence, and effectuated a warrantless arrest—infringing on his constitutional rights. *See* U.S. CONST. amend. IV. Jones further argued that he was not *Mirandized* prior to speaking with law enforcement, and he did not consent to a field sobriety test or receive statutory warnings before providing a blood sample. The trial court held a two-part hearing on Jones's motion via Zoom on October 5, 2020, and November 2, 2020.

### A.    Suppression Hearing

#### 1.    The Reserve Witnesses

Two witnesses, Michael Kent Brooks and Lou DeLira, testified that they observed an individual later identified as Jones at The Reserve at Lake Travis, a gated community, in the hours preceding Jones's arrest. Brooks, a development manager for The Reserve, testified that he saw Jones "in th[e] window of maybe 10:00 [a.m.] to 2:00 [p.m.]" operating a "red four-wheeler." Brooks witnessed Jones drive through a landscape median, "r[u]n

2

into the garage of a unit," and then hit the gate as he was attempting to exit The Reserve. Brooks opined that Jones "seemed" to be "intoxicated" and was nonresponsive when Brooks attempted to intervene before Jones struck The Reserve gate. After Jones exited The Reserve, Brooks followed Jones in his own vehicle to a neighboring gated community, The Coves, and called the local sheriff's department. Jones was unable to gain entry into The Coves and shifted his focus to Brooks, pursuing Brooks for an unspecified period before returning to The Coves and successfully inputting the gate code. Brooks entered into The Coves behind Jones and followed Jones until he "turn[ed] into" the driveway of a residence. Brooks then "backed off," exited The Coves, and waited for law enforcement to arrive.

During cross-examination, Brooks confirmed that he lost sight of Jones as Jones drove up the driveway, and he never saw Jones park or exit the vehicle but presumed that he did so where the driveway curved behind the residence. In the image below, the driveway entry is located on the upper, left-hand corner; midway up the driveway, the driveway forks with the right side continuing behind the residence to the garage area, unviewable from the foot of the driveway or any streets surrounding the home.[2]

---

[2] This image is a screenshot taken from Jones's video exhibit admitted at the suppression hearing.



DeLira testified that he had been working as a security officer at The Reserve when he approached Jones sometime between 12 p.m. and 3 p.m. on May 26, 2018. DeLira saw Jones "staggering" and struggling to "keep[] his balance" while walking around the pool area. This observation prompted DeLira to escort Jones to a shaded nearby structure, where DeLira provided Jones with some water. "[C]oncerned about who [had been] actually serving" Jones, DeLira left Jones unattended in search of the bar manager. Jones was gone when DeLira returned. A few minutes later, DeLira received reports that an individual driving a "large four-wheeler," "mule type" vehicle had "barreled" through the front entrance gate of The Reserve. DeLira later identified Jones at Jones's residence as the intoxicated individual he had interacted with at The Reserve.

## 2. Law Enforcement Testimony

Deputy John Cavendish with the Travis County Sheriff's Office testified that he was dispatched to The Reserve at 4:55 p.m., following reports of a "male in a red dune buggy vehicle" that had struck property, causing "at least $20,000" in damages. Brooks briefed Deputy Cavendish on what he had witnessed, and Deputy Cavendish testified that Brooks was also "able to get ahold of someone on [The Coves's] homeowners' association

4

[(HOA)]" to provide law enforcement with an address of the individual believed to have a "vehicle like" the one allegedly involved.

At approximately 5:42 p.m., Deputy Cavendish entered The Coves accompanied by DeLira and two other deputies, Richard Rigsby and Edward Paul Coleman. Deputy Cavendish testified that once they were at the residence, he and Deputy Rigsby walked up the driveway and continued past the path which led to the front door of a courtyard. For reference, below is a photograph exhibit admitted by the trial court depicting the residence, including the courtyard entrance situated between two windows and viewable immediately upon entering the driveway.



The officers walked behind the residence, where they located a vehicle matching witnesses' descriptions parked outside the garage. Deputy Cavendish testified, after they "[f]ound the vehicle, [they] kind of examined it, [and] saw the damage to the front and to the wheels." Officers then returned to the front of the residence, where Deputy Rigsby made contact with a woman who was in the residence's gated backyard pool area. Deputy Cavendish testified that she retreated into the residence, and the officers returned to the

courtyard door, where they met with the woman and Jones. Deputy Cavendish testified that Jones admitted to having driven the vehicle, and Brooks identified Jones as the driver of the vehicle. Deputy Cavendish noted that Jones had bloodshot eyes, was unsteady on his feet, and emanated a "[h]eavy odor of alcohol." Jones was unable to complete field sobriety tests and was subsequently arrested for DWI.

Deputy Rigsby testified that he was the officer responsible for opening the entrance gate at The Coves, and he had used an index of gate codes saved in his phone. Deputy Rigsby observed "black marks going up" the driveway once they reached the residence and testified that the officers first sought to find the implicated vehicle, found the vehicle parked outside the garage behind the residence, and inspected the vehicle for damage. While "investigat[ing] a little bit farther" and making his way back to the front of the property, Deputy Rigsby heard a woman outside in a pool area. Deputy Rigsby informed her that he was "looking for a male" and "she walked off." Deputy Rigsby testified that the officers waited outside the courtyard door for her to return. "I think we knocked on th[e] [windows of the courtyard] and we knocked on the door and then she came to the door with [Jones]," Deputy Rigsby explained. According to Deputy Rigsby, Jones admitted to driving the vehicle "four or five hours earlier," but "he didn't remember hitting anything." Deputy Cavendish then accompanied Jones inside to retrieve Jones's identification (ID). Deputy Rigsby denied entering the home and could not recall if Deputy Cavendish had been "invited."[3]

---

[3] Neither the State nor Jones's counsel elicited testimony from Deputy Cavendish regarding whether he had entered the home invited or uninvited.

Deputy Coleman testified that he had been present to assist but could not recall how the officers gained entry into The Coves. Deputy Coleman further testified that the officers first "found the vehicle," noted the "damage to it so [they] knew [they] were probably at the right place," and then "went over to the fence" to speak to a woman in the backyard. Someone asked her to go inside and retrieve the driver, and Jones met with officers at the front door of the courtyard. Deputy Coleman testified that Deputy Cavendish asked Jones to produce his ID, Deputy Cavendish and Jones "went back into the residence for . . . a minute or two," and the "DWI investigation" ensued.

### 3. Dalia Jones

Dalia, Jones's mother, testified that she had been outside by the pool when the officers approached the fence line, asking her if she was the owner of the residence. Dalia testified that she only speaks Portuguese, and the officers attempted to communicate with her in English and Spanish. Dalia thereafter went into the residence to "see [her] son." While inside the home, Dalia heard the officers "knock[ing] at the [courtyard] door," stating, "'let me in; let me in,'" and "'open the door, open the door.'" When she opened the door, they entered into the courtyard uninvited. Dalia denied inviting law enforcement onto the property or giving the officers consent to be inside the courtyard or inside the home. Dalia also testified that the officers came to speak with Jones by going inside the home, into Jones's bedroom.

## B. Findings of Fact and Conclusions of Law

The trial court granted Jones's motion and issued findings of fact and conclusions of law, which stated in relevant part:

7

14. All the officers entered The Coves; a private, gated community[,] uninvited.

15. . . . [Deputy] Cavendish arrived at . . . the address given by Brooks where Brooks had seen the vehicle enter the driveway and where Brooks had learned from an HOA representative that someone at that address had a vehicle Brooks described as having seen Jones drive.

16. [Deputy] Cavendish and Deputy Richard Rigsby went onto the property and walked around the right side of the residence along the driveway to the back where they saw the vehicle driven by Jones outside the garage doors.

17. [Deputies] Cavendish and Rigsby saw a woman and children at the pool area and went up to the fence to engage the woman in conversation.

18. [Deputy] Rigsby tried speaking with her—Dalia Jones, mother of Glover Jones—in Spanish as she spoke Portuguese. Some communication seemed to have been made but Dalia Jones is not a Spanish nor English speaker.

19. Dalia Jones did not consent to the entry of the officers onto the property nor into the residence, her residence[,] and the residence of Glover Jones, her son.

20. Dalia Jones went into the residence and seems to have produced Glover Jones, getting him to the front door.

21. There is a gated courtyard outside the front door of the residence. An officer pounded on what sounded like a hollow metal door which leads into the courtyard. Officers entered the courtyard uninvited.

22. Dalia or Glover Jones opened the front door to the residence and officers engaged Glover Jones in conversation about the alleged offenses—criminal mischief, reckless driving, and D.W.I.

. . . .

1. There was probable cause and reasonable suspicion to believe that Glover Jones committed the offenses of criminal mischief, reckless driving, and [DWI], based on the observations, information conveyed to law enforcement officers at the time, and the testimony of Michael Brooks and Lou DeLira.

8

2. Although there was no gate and no signage at [Jones's residence] which would indicate that entrance onto the property was prohibited and so the officers might have otherwise legitimately entered the property; the fact that this is a private, gated community and the law enforcement officers entered the community uninvited, negates that legitimacy.

3. Having entered the private community uninvited by any resident, the officers were not legitimately on the premises—the driveway, the courtyard[,] and the home—for the purpose of specifically investigating allegations against Glover Jones.

4. Even if the officers were legitimately on the premises of [Jones's residence], uninvited entrance through the courtyard door/gate was unlawful.

5. Even if the officers were legitimately on the premises of [Jones's residence], they exhibited such a show of force that Dalia and Glover Jones could not conceive that they had a right to resist the officers' intrusion through the courtyard door/gate and at the front door.

6. All oral, written, observed and physical evidence obtained from Glover Jones is suppressed.

7. The [S]tate has not met its burden to prove that exigent circumstances existed such that timely securing of a warrant by electronic means or any other means was prohibitive under the circumstances . . . .

This appeal followed. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5).

## II. WARRANTLESS SEARCH AND SEIZURE

By two issues, the State asserts that the trial court erred in granting Jones's motion to suppress evidence obtained from the warrantless search of his residence and warrantless seizure of his person.

## A. Standard of Review

A trial court's ruling on a motion to suppress evidence is reviewed under a bifurcated standard. *Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021). "We

9

give almost total deference to the trial court's findings of fact and review *de novo* the application of the law to the facts." *Id.* (quoting *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019)). We must view all of the evidence in the light most favorable to the trial court's ruling. *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021), *cert. denied*, 142 S. Ct. 821 (2022). If the trial judge's decision is correct on any theory of law applicable to the case, the decision will be upheld. *Martin*, 620 S.W.3d at 759.

## B.    Applicable Law

"The text of the [Fourth] Amendment expressly imposes two requirements[:] [f]irst, all searches and seizures must be reasonable[;] [s]econd, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citing U.S. CONST. amend. IV); *Martin*, 620 S.W.3d at 759. Such special protections attach to the home. *Martin*, 620 S.W.3d at 759. "At the [Fourth] Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "To give full practical effect to that right, the Court considers curtilage—the area immediately surrounding and associated with the home—to be part of the home itself for Fourth Amendment purposes." *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (quoting *Jardines*, 569 U.S. at 6) (cleaned up). "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987).

## 1. Warrantless Search

"When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred." *Collins*, 138 S. Ct. at 1670. "[A] warrantless search of a home is presumptively unreasonable." *Martin*, 620 S.W.3d at 759. Where a defendant establishes that a warrantless search occurred, "the State has the burden of showing that probable cause existed at the time the search was made and that exigent circumstances requiring immediate entry made obtaining a warrant impracticable." *Turrubiate v. State*, 399 S.W.3d 147, 151 (Tex. Crim. App. 2013). "If either probable cause or exigent circumstances are not established, a warrantless entry will not pass muster under the Fourth Amendment." *Parker v. State*, 206 S.W.3d 593, 597 (Tex. Crim. App. 2006). "Probable cause exists when reasonably trustworthy circumstances within the knowledge of the police officer on the scene would lead him to reasonably believe that evidence of a crime will be found." *Turrubiate*, 399 S.W.3d at 151. Exigent circumstances justifying a warrantless entry include "(1) providing aid to persons whom law enforcement reasonably believes are in need of it; (2) protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous; or (3) preventing the destruction of evidence or contraband." *Ratliff v. State*, No. PD-0545-20, 2022 WL 791673, at *9 (Tex. Crim. App. Mar. 16, 2022); *see also Lange v. California*, 141 S. Ct. 2011, 2017–18 (2021) (reviewing well-recognized exceptions for warrantless entry onto private property).

Pertinent to this appeal, voluntary consent to search is a recognized exception to the warrant requirement that exists separate from any exigency exception. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003). However, officers which seek

11

consent-based encounters must first be "lawfully present in the place where the consensual encounter occurs." *King*, 563 U.S. at 463.

### 2. Warrantless Arrest

This case also concerns a warrantless arrest. *See Parker*, 206 S.W.3d at 596 (noting that the standards for warrantless search of a residence differ from those for a warrantless arrest, and "[e]ach action requires the police to jump over two distinct hurdles"). To execute a warrantless arrest, "a police officer must have both probable cause *with respect to the person being arrested*, plus statutory authority to make that arrest." *Id.* at 596–97. "An arrest without probable cause that is investigatory or was designed to cause fright, surprise, and confusion is flagrant police misconduct." *Martinez v. State*, 620 S.W.3d 734, 742 (Tex. Crim. App. 2021).

Under Article 14.01, a police officer can arrest a person "without a warrant for any offense committed in his presence or within his view." TEX. CODE CRIM. PROC. ANN. art. 14.01. Also, controlling is Article 14.05, which provides:

> [A]n officer making an arrest without a warrant may not enter a residence to make the arrest unless: (1) a person who resides in the residence consents to the entry; or (2) exigent circumstances require that the officer making the arrest enter the residence without the consent of a resident or without a warrant.

*Id.* at art. 14.05.

Just as with a warrantless search, "[t]he burden is on the State to establish the reasonableness of a warrantless arrest," and "the circumstances and details surrounding the questioning and arrest are relevant to the [reasonableness] inquiry." *Martinez*, 620 S.W.3d at 740, 742; *see also Lange*, 141 S. Ct. at 2017–18, 2020 (noting limitations to the exigency exception, such as when it rejected the State's contention that exigent

12

circumstances supported the entry into a residence "because the driver's 'blood-alcohol level might have dissipated while the police obtained a warrant'" where the "driver had been charged with only a minor offense" (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 754 (1984))).

**C.     Analysis**

The trial court concluded "[t]here was probable cause and reasonable suspicion to believe that" Jones had committed several misdemeanor offenses, but the State had failed to prove that officers were lawfully on the premises. More specifically, the trial court found that the officers did not receive consent to be inside the gated community, on the residence premises, or inside the home, and no exigent circumstances existed.

On appeal, the State maintains that the officers' entry and activity on the property was lawful, arguing: (1) the officers' uninvited entry into The Coves does not create an unlawful presence because a gated community is a public place; (2) the officers' walk up the driveway behind the residence to look for the suspect vehicle was not a search so as to initiate a Fourth Amendment warrantless search inquiry; and (3) the officers were conducting a lawful "knock and talk" procedure when they engaged Dalia and Jones. Though the State alluded to the existence of exigent circumstances in its questioning of the officers, the State does not argue on appeal that exigent circumstances existed.

**1.     Entrance into The Coves**

Here, as established by the trial court's written findings and supported by the record, we accept the following facts as true: The Coves is a "private, gated community," which was open to any resident or guest with gate code access; the officers gained entry "uninvited" using a previously saved gate code; the officers were acting in furtherance of

13

a misdemeanor investigation; and Jones's address was known to the officers prior to entry.

To the State's first contention, we agree that the common areas of the gated community, namely, the roads which begin at the gate and ultimately intersect with other streets leading to residential driveways, would constitute a public place for purposes of this appeal. *See* TEX. PENAL CODE ANN. § 1.07(a)(40) (defining "[p]ublic place" as "any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment residences, office buildings, transport facilities, and shops"). That The Coves limits public access does not disqualify its common areas from being recognized as public places. *See Quinones v. State*, 325 S.W.3d 801, 804 (Tex. App.—Amarillo 2010, no pet.) (observing the broad interpretation afforded to "public place" and that such phrase may encompass "a gated community monitored by security guards"); *see, e.g., State v. Gerstenkorn*, 239 S.W.3d 357, 359 (Tex. App.—San Antonio 2007, no pet.) (reversing a trial court's order granting a motion to suppress on the basis that the appellee was stopped for suspicion of DWI in a "gated community," and concluding that the trial court erred in finding a "gated community" is not a "public place"); *Woodruff v. State*, 899 S.W.2d 443, 445 (Tex. App.—Austin 1995, pet. ref'd) (concluding an air force base is a public place even though the access gates were guarded twenty-four hours a day and the base "wasn't open just for any vehicle to come on base"; the court reasoned that "restrictive measures" to limit access are inconsequential where anyone could gain access "given the right set of circumstances"); *see also State v. Vaughn*, No. 03-21-00300-CR, 2022 WL 1008800, at *4 (Tex. App.—Austin Apr. 5, 2022, no pet. h.) (mem.

14

op., not designated for publication) (reviewing caselaw wherein courts have held parking lots of gated complexes are considered "public places").

Affixed to the State's first issue, however, is the legal inquiry posed by Jones and answered in the affirmative by the trial court: do Fourth Amendment protections extend to the gate of an individual's gated community? We conclude that it does not, and we find guidance in an analogous case from our sister court. *See Evans v. State*, 995 S.W.2d 284, 286 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). In *Evans*, officers were dispatched to an apartment complex pursuant to an investigation and arrived to find the complex gated. *Id.* at 285. They "us[ed] one of the officers' standard 911 key[s]" to enter the complex. *Id.* Appellant was subsequently arrested, and she challenged the officers' "unauthorized" entry into the gated complex, asserting that the curtilage of her apartment extended to its gated entryway. *Id.* Appellant argued that "because her apartment complex was surrounded by a security fence intended to keep out the general public, she had a reasonable expectation of privacy in the common area." *Id.* at 286. The *Evans* court concluded otherwise, determining that the officers' entry and presence in the common areas of the gated apartment complex was not constitutionally infirm. *Id.* The court reasoned that the gated apartment complex "was open to any resident or guest as a common means of ingress and egress," and "[g]iven the nature and use of the area," appellant's actual expectation of privacy was not "one that society [was] prepared to recognize as reasonable." *Id.*; *see also State v. Rendon*, 477 S.W.3d 805, 811 (Tex. Crim. App. 2015) (noting that "courts have determined that the 'common areas' of an apartment complex are outside the curtilage"); *see generally Collins*, 138 S. Ct. at 1675 (declining to create a bright line rule for curtilage where it would "automatically . . . grant

15

constitutional rights to those persons with the financial means . . . but deprive those persons without such resources of any individualized consideration").

Under the facts of this case and having already concluded that the roadways within the gated community constitute public spaces, we likewise resolve that the mere existence of a gated community does not extend an individual's Fourth Amendment rights to the entryway of the said community. *See Jardines*, 569 U.S. at 6 (observing that "[t]he Fourth Amendment does not . . . prevent all investigations conducted on private property; for example, an officer may . . . gather information in what we have called 'open fields'— even if those fields are privately owned—because such fields are not enumerated in the Amendment's text"); *Katz v. United States*, 389 U.S. 347, 353 (1967) ("[T]he reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure."); *see, e.g.*, *State v. Rendon*, 476 S.W.3d 77, 83 (Tex. App.—Corpus Christi–Edinburg 2014), *aff'd*, 477 S.W.3d 805 (concluding an officer was unlawfully within the curtilage of a defendant's apartment when in the area "immediately in front of the apartment's door," and distinguishing these facts with *Evans*). The officers' lawful entry or presence in The Coves, however, does not alleviate the State's burden of showing that the warrantless search or warrantless arrest that followed were also lawful. *See Parker*, 206 S.W.3d at 596. Because the State's first issue is not dispositive, we continue our analysis of the officers' entry onto Jones's curtilage. *See generally* Tex. R. App. P. 44.2.

### 2. Entrance onto Jones's Curtilage

The State maintains by its second issue that the Fourth Amendment was not implicated simply because officers entered the driveway of the residence and immediately sought to find the vehicle believed to be involved before making contact with Jones; thus,

16

the State avers that it was not required to prove an exception to the warrant requirement. We disagree that such conduct by law enforcement constituted anything but a warrantless search of Jones's curtilage. To the extent that the State characterizes this conduct as a permissible "knock and talk," we also disagree.

Both the Supreme Court and court of criminal appeals have recognized that "[n]othing in our Constitutions prevent[s] a police officer from . . . knocking politely on any closed door," and "[r]easonable suspicion was not required" for such encounter. *State v. Perez*, 85 S.W.3d 817, 819 (Tex. Crim. App. 2002) (quoting *Cornealius v. State*, 900 S.W.2d 731, 733 (Tex. Crim. App. 1995) (en banc)); *see King*, 563 U.S. at 469–70 ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do."). "Such an encounter is a consensual interaction," which does not "trigger[] Fourth Amendment scrutiny or constitutional analysis, unless it loses its consensual nature." *Howard v. State*, 624 S.W.3d 14, 20 (Tex. App.—Houston [1st Dist.] 2021, pet. ref'd). The test for whether an encounter is consensual is "both objective and fact specific" and requires that we "consider all of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *State v. Garcia-Cantu*, 253 S.W.3d 236, 242–43 (Tex. Crim. App. 2008) (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). A citizen-police encounter warrants Fourth Amendment protections where the police officer "engages in conduct which a reasonable man would view as threatening or offensive even if performed by another private citizen." *Id.* at 243.

Problematic here is that the officers did not simply walk to the front door of the residence in an attempt to effectuate contact. Instead, Deputy Cavendish and Deputy Rigsby, the two officers which led the investigation, continued up the driveway to the back of the residence where they suspected the vehicle was parked. We once more include an image of the property, taken from Jones's video exhibit, for reference.



The officers admittedly deviated from the walking path that "background social norms [dictate] invite a visitor to the front door" and did so in search of evidence. *See Jardines*, 569 U.S. at 9 (explaining that law enforcement "explor[ing] the area around the home in hopes of discovering incriminating evidence" is a divergence from a permissible "knock and talk"). And to be sure, a vehicle parked in close proximity to a garage, unviewable from the street, obstructed by a wooded area, and affixed to a residence is entitled to protection from a warrantless search. *See Collins*, 138 S. Ct. at 1675.

We find a recent Supreme Court case to be most instructive. *See id.* In *Collins*, an officer entered a driveway, deviated from the turn off point which led visitors to the front door, and without a warrant, searched a motorcycle parked inside a "partially enclosed

18

top portion of the driveway that abuts the residence." *Id.* at 1671. The Court held that "[j]ust like the front porch, side garden, or area outside the front window," the driveway attachment "constitutes an area adjacent to the home and to which the activity of home life extends, and so is properly considered curtilage." *Id.* (quoting *Jardines*, 569 U.S. at 6, 7) (cleaned up); *see State v. Serna*, No. 03-20-00087-CR, 2021 WL 5456652, at *1, *6 (Tex. App.—Austin Nov. 17, 2021, no pet.) (concluding that a vehicle parked "a short distance within the driveway and beneath the carport" nonetheless "enjoyed a legitimate expectation of privacy in the home's curtilage"); *State v. Pena*, 464 S.W.3d 389, 401 n.4 (Tex. App.—Corpus Christi–Edinburg 2014, pet. ref'd) (concluding a backyard "located in a wooded area" and "not visible from the main road or from the front of the home" was "considered 'curtilage' of the defendant's residence").

In physically intruding upon Jones's curtilage to gather evidence, the officers here—as in *Collins*—engaged in a search within the meaning of the Fourth Amendment, and such conduct was presumptively unreasonable without a warrant. *See Collins*, 138 S. Ct. at 1670; *see also Garcia v. State*, No. 13-03-168-CR, 2004 WL 2615118, at *3 (Tex. App.—Corpus Christi–Edinburg Nov. 10, 2004, no pet.) (mem. op., not designated for publication) (concluding the officers entered the curtilage of the defendant's home when officers went "past the front door, around the residence, and to the back to reach the yard," and "the intrusion was a search"). Moreover, the warrantless search of the curtilage preceded any purported consent, and the State does not assert on appeal that an exigent circumstance existed. *See Martin*, 620 S.W.3d at 759; *Parker*, 206 S.W.3d at 597; *see also King*, 563 U.S. at 463. Thus, the trial court did not err in concluding the

officers conducted an invalid warrantless search or in suppressing evidence obtained in relation. *See Martin*, 620 S.W.3d at 759.

We turn now to address whether the officers' entry and warrantless arrest of Jones, which followed the unlawful warrantless search, was nonetheless lawful. *See* TEX. CODE CRIM. PROC. ANN. art. 14.05 (requiring exigent circumstances be present or consented entry into a residence be shown for a warrantless arrest in a residence to be lawful); *Martinez*, 620 S.W.3d at 740. The State did not specifically brief the effect of "the taint inherent in the illegal" warrantless search on the consent the officers allegedly subsequently received. *See Pena*, 464 S.W.3d at 399 (reviewing factors to be considered in a taint analysis: "(1) the temporal proximity between the unlawful search and the given consent; (2) whether the warrantless search brought about police observation of the particular object for which consent was sought; (3) whether the search resulted from flagrant police misconduct; (4) whether the consent was volunteered or requested; (5) whether appellant was made fully aware of the right to refuse consent; and (6) whether the police purpose underlying the illegality was to obtain the consent"). Instead, the State argues that the lack of evidence "that officers forced their way into the front door," coupled with the fact that "the trial court found that 'Dalia or [Jones] opened the front door,'" is indicative of Dalia or Jones's "intentional relinquishment of any subjective expectation of privacy." In other words, the State maintains that Jones consented to the officers' presence on his property and inside his home. Having reviewed the totality of the circumstances and deferring to the trial court's findings of fact, we disagree that Jones voluntarily consented to the officers' entry. *See Garcia-Cantu*, 253 S.W.3d at 241; *see also Tippin v. State*, No. 13-17-00201-CR, 2018 WL 3675646, at *5 (Tex. App.—Corpus

20

Christi–Edinburg Aug. 2, 2018, pet. ref'd) (mem. op., not designated for publication) (concluding that in a knock-and-talk investigation, whether a defendant voluntary consented to officer entry into the residence "is a question of fact to be determined from the totality of the circumstances").

As noted *supra*, there was no evidence that the officers first attempted to contact the owner of the residence by use of the front door even after conducting an unlawful warrantless search. *See Jardines*, 569 U.S. at 9. When officers did initiate contact with a resident, it was following another impermissible deviation from the front door walk path, onto an area obscured from public view, and communication occurred through a backyard gate partition. *See King*, 563 U.S. at 463; *Pena*, 464 S.W.3d at 401 n.4; *cf. Duhig v. State*, 171 S.W.3d 631, 637 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (concluding officers were not trespassing where they approached the back of a residence to contact the owner after first trying the front door and receiving no answer). Dalia testified that her comprehension of the exchange was limited due to a language barrier. *See generally Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000) (reviewing factors to be considered when determining whether consent is voluntarily provided in a search and seizure). She further testified that when she was inside retrieving Jones, she heard officers repeatedly knocking on the closed door of the courtyard, asking to be let inside. According to Dalia, she opened the courtyard door, and officers "entered without permission" into the courtyard. Dalia denied ever providing consent.

21

While the officers uniformly testified that Jones came to or opened the courtyard door,[4] a fact the trial court accepted as true, there was little evidence to support the State's position that Dalia or Jones consented to the officers' entry beyond the courtyard door—an area we recognize to be part of the curtilage of the home. *See Jardines*, 569 U.S. at 1, 7 (regarding the front porch of a home, "the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends'" to be within the curtilage boundaries (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984))). Deputy Cavendish was not questioned regarding the circumstances in which he entered the courtyard, and Deputy Rigsby testified that they had *not* been invited on the property, stating, "No, no. People usually don't—when you're conducting an investigation[,] they usually don't invite you onto their property." The only testimony close to affirming that officers had received consent to enter the home came from Deputy Coleman, who merely insinuated permission had been granted: "[Jones] was going to go back inside and get [his ID] and Deputy Cavendish said, ['W]ell, do you mind if I come with you?['] And that's what they did."

---

[4] The State cites to *Rodriguez v. State*, 653 S.W.2d 305, 307 (Tex. Crim. App. 1983) (en banc) in support of its proposition that by admitting to opening the door, Dalia and Jones relinquished any subjective expectation of privacy. In *Rodriguez*, appellants were weighing drugs "in an area clearly visible from the door to the outside." *Id.* The court held that appellants had intentionally relinquished any subjective expectation of privacy by opening the front door to the officers because they had to have known that their "illegal activity may be readily detected by smell and sight by anyone standing at the doorway." *Id.* The facts before us are distinguishable. *Cf. id.* Though Dalia or Jones may have opened the door, the entry that followed was not due to the officers' observations of readily detected illegal activity or in furtherance of preventing the destruction of evidence. *See id.*; *but see Turrubiate v. State*, 399 S.W.3d 147, 149, 155 (Tex. Crim. App. 2013) (concluding warrantless entry into home was not permissible simply because appellant opened the door when officers knocked and "noticed a strong odor of marijuana from within the home"; exigent circumstances were required to be present); *see also Frost v. State*, No. 13-20-00459-CR, 2021 WL 2836365, at *4 (Tex. App.—Corpus Christi–Edinburg July 8, 2021, no pet.) (mem. op., not designated for publication) (observing the limited circumstance with which *Rodriguez* applies and noting that the general proposition in *Frost* "seems to contradict *Turrubiate* and other more recent authorities, which require affirmative conduct" before warrantless entry can be justified).

Audio recordings from the officers' body camera were additionally admitted into evidence, but much of the content is inaudible until the 5:48 p.m. timestamp,[5] when an officer can be heard asking Jones if he lives at the residence, who else lives at the residence, and where the current owner is. Jones was then instructed that he could not "go anywhere," and he was asked to produce an ID. Someone is then told to "[g]o in there and get his ID." Jones was thereafter ordered to "show [the officer] where the room is." *See Howard*, 624 S.W.3d at 20 ("The purpose of a knock-and-talk is not to create a show of force, make demands on occupants, or to raid a residence.").

It cannot be said that a "knock-and-talk" occurred where officers unlawfully searched the curtilage, continued to trespass, then knocked at the front door, and proceeded to treat the interaction and entry as if Fourth Amendment protections did not exist. *See Garcia-Cantu*, 253 S.W.3d at 242 ("[A] seizure occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." (quoting *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (per curiam) (cleaned up))); *see also King*, 563 U.S. at 463; *Martinez*, 620 S.W.3d at 740–42. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'" and we decline to find that under these facts, the State has proven that Jones or Dalia voluntarily consented to the officers' entry into the curtilage. *King*, 563 U.S. at 459 (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)). Thus, the trial court properly concluded

---

[5] Deputy Cavendish and Deputy Rigsby's vehicle dash camera recordings were also admitted into evidence, which indicated that the officers parked their vehicles at the foot of the driveway and began walking up the driveway at 5:42 p.m.

that the officers were unlawfully on the curtilage; and absent argument that another exception was present (i.e., exigent circumstances), we affirm the trial court's conclusion that any searches and seizures that followed were unlawful. *See* TEX. CODE CRIM. PROC. ANN. art. 14.05; *Parker*, 206 S.W.3d at 597.

We overrule the State's second issue.

### III. CONCLUSION

We affirm the trial court's order.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
26th day of May, 2022.